# UNITED STATES NAVY-MARINE CORPS COURT OF CRIMINAL APPEALS WASHINGTON, D.C.

**Before**
**F.D. MITCHELL, J.A. FISCHER, M.K. JAMISON**
**Appellate Military Judges**

**UNITED STATES OF AMERICA**

**v.**

**GIOVANNI MAZA**
**GUNNERY SERGEANT (E-7), U.S. MARINE CORPS**

**NMCCA 201300297**
**Review Pursuant to Article 62(b), Uniform Code of Military Justice,**
**10 U.S.C. 862(b)**

**Military Judge:** CDR R.P. Monahan, Jr., JAGC, USN.
**Convening Authority:** Commanding General, Training Command, Marine Corps Base Quantico, VA.
**For Appellant:** Maj Paul Ervasti, USMC.
**For Appellee:** LT Jennifer Myers, JAGC, USN.

**22 January 2014**

---
**PUBLISHED OPINION OF THE COURT**
---

JAMISON, Judge:

## I. Introduction

This case is before us on a Government interlocutory appeal, pursuant to Article 62, Uniform Code of Military Justice, 10 U.S.C. § 862, and RULE FOR COURTS-MARTIAL 908, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). The appellee, Gunnery Sergeant Giovanni F. Maza, U.S. Marine Corps, is currently charged with four specifications of a violation of a lawful general regulation and two specifications of sexual assault, in violation of Articles 92 and 120(b), Uniform Code of Military Justice, 10 U.S.C. §§ 892 and 920(b).[1]

---
[1] The appellee was originally charged with five specifications of a violation of a lawful general regulation, one specification of a violation of a lawful

Prior to trial, the appellee moved to suppress his 22 October 2012 oral and written statements made to Special Agent (SA) KS, U.S. Army Criminal Investigation Command (CID), Fort Leonard Wood, Missouri, based on SA KS's failure to honor the appellee's request for counsel.  On 12 June 2013, the military judge denied the appellee's motion to suppress.  On 17 June 2013, the appellee pled guilty to Charge I and its sole remaining specification (violation of a lawful general order by wrongfully engaging in an unprofessional relationship with a student), and the case proceeded to trial by a panel of officer members on the remaining charged offenses.  On 19 June 2013, the appellee entered into a stipulation of fact admitting to oral and vaginal sex with the alleged victim, Private First Class (PFC) KL (KL).  Prosecution Exhibit 19.

Following the presentation of its case-in-chief, the Government rested and the appellee began his case-in-chief.  After four days of testimony, the appellee moved to compel the production of additional witnesses.  On 21 June 2013, the military judge granted the motion for production of additional witnesses and continued trial until 17 July 2013.

On 26 June 2013, the Court of Appeals for the Armed Forces (CAAF) handed down its decision in *United States v. Hutchins*, 72 M.J. 294 (C.A.A.F. 2013).  Believing that *Hutchins* may affect the appellee's prior unsuccessful motion to suppress, the military judge *sua sponte* directed both parties to address the potential impact of the holding in *Hutchins*.  In response, the appellee submitted a renewed motion to suppress his oral and written statements.  Additionally, the appellee, for the first time, moved to suppress his DNA sample arguing that following his oral and written statements to CID agents, his consent to the agents taking a buccal swab was involuntary.

---

general order, and two specifications of sexual assault.  On 17 June 2013, the military judge dismissed Specification 1 of Charge I on the basis that it was multiplicious with Specification 1 of Additional Charge II.  Record at 36 of Vol. IV.  The appellee pled guilty to the remaining specification under Charge I (violation of lawful general order by wrongfully engaging in an unprofessional relationship with a student, KL), excepting the following words:  "between on or about 21 September 2012 and."  *Id*. at 54 of Vol. IV.  Following the providence inquiry, the military judge found the appellee guilty of Charge I and its specification as excepted and the Government moved to withdraw the excepted words.  *Id*. at 77 of Vol. IV.  Because the original record in this case is not consecutively paginated, citations reflect both the volume and page number.

On 10 July 2013, the military judge reconsidered his prior ruling and concluded that *Hutchins* expanded the *Edwards per se* rule[2] to prohibit law enforcement from engaging with an accused post-invocation of counsel in any "'communication, exchange[], or conversation[]' that may . . . lead to further interrogation."[3]  As a result, the military judge suppressed the appellee's oral and written statements to SA KS.  Additionally, the military judge suppressed the appellee's DNA sample taken from the buccal swab as derivative evidence of his suppressed statements.  Appellate Exhibit CXX at 24.

On 11 July 2013, the Government filed its written notice of appeal pursuant to R.C.M. 908.  In its interlocutory appeal, the Government argues that the military judge abused his discretion in ruling that *Hutchins* requires, as a matter of law, the suppression of the appellee's oral and written statements to SA KS.  Additionally, the Government argues that even assuming the appellee's statements must be suppressed in light of *Hutchins*, the military judge abused his discretion in suppressing the appellee's DNA evidence as derivative evidence.[4]

After carefully considering the record, the military judge's findings of fact and conclusions of law, the submissions of the parties, and the excellent oral argument by both parties, we conclude that the military judge erred in suppressing the appellee's statements to SA KS.  We disagree with the military judge's legal conclusion that *Hutchins* created a new expansion of the Edwards *per se* rule and therefore suppression of the appellee's oral and written statements was required.  Accordingly, we hold that under the circumstances of this case, SA KS did not reinitiate communication with the appellee and thereby trigger an *Edwards* violation.  Additionally, we conclude that the military judge erred by suppressing the appellee's

---

[2] The *Edwards* rule is a judicial prophylactic measure that creates a *per se* bar prohibiting police from interrogating a suspect once he invokes his right to counsel, unless the suspect initiates further communication with police. *Edwards v. Arizona*, 451 U.S. 477 (1981).

[3] Appellate Exhibit CXX at 10 (quoting *Hutchins*, 72 M.J. at 298).

[4] The specific issues raised by the Government are: (1) "Did the Military Judge err in finding that CAAF's decision in *United States v. Hutchins* compelled the conclusion that [the appellee's] statement must be suppressed, because [the appellee] did not initiate further communication with law enforcement after he had invoked his right to counsel?" (2) "Even assuming arguendo that [the appellee's] statement must be suppressed, did the military judge err in ruling that the physical DNA evidence must also be suppressed?" Government Brief on Interlocutory Appeal of 20 Aug 2013 at 2-3.

3

buccal cells as derivative evidence of the Edwards violation rather than evaluating whether the appellee's consent to seize his buccal cells was freely and voluntarily given.

## II. Background: Issue I

The majority of the pending charges stem from an encounter between the appellee and the alleged victim, KL, which occurred during the early morning hours of 21 October 2012. The appellee, an instructor and a staff noncommissioned officer-in-charge, was standing duty as the Command Duty Officer for the Marine Detachment. KL, a "Marine Awaiting Training," had been assigned fire watch duty for the female barracks. While on duty, the two left to inspect the barracks. The appellee's and KL's accounts of what happened during the inspection of the barracks rooms differ and are not relevant to this appeal. Later that day, KL made allegations of sexual assault and sexual harassment against the appellee. Based on KL's allegations, SA KS sought to interview the appellee the following day. Upon being advised of his rights under Article 31(b), UCMJ, the appellee requested counsel. Following various exchanges between SA KS and the appellee, which are the subject matter of this interlocutory appeal, the appellee provided a ten-page sworn statement admitting to various sexual acts with KL, but claiming that KL consented. AE XX at 6-19.

In pretrial litigation, the appellee moved to suppress his oral and written statements. AE XX. The Government opposed the motion, AE XXI, and called SA KS as a witness in support of its opposition. Following SA KS's testimony, the appellee testified and trial defense counsel conceded that SA KS's testimony had been "largely corroborated." Record at 262 of Vol. III. The military judge made extensive findings of fact as to Issue I and later re-affirmed those same findings in his reconsideration ruling. *Compare* AE IL at 2-4 *with* AE CXX 2-5.

### *Findings of Fact by the Military Judge*

Recited verbatim below are the military judge's findings pertaining to Issue I:

a. [The appellee] has been charged with violating Articles 92 and 120 of the Uniform Code of Military Justice for (1) sexually harassing Lance Corporal M.R., [KL], and Lance Corporal M.W., (2) violating various lawful general orders for engaging in an unprofessional relationship with [KL] and with LCpl M.R., and (3) for sexually assaulting [KL].

4

b. On 22 October 2012 at 1006, SA [KS], Fort Leonard Wood Army CID, attempted to interview the accused at the base CID office.

c. Prior to the attempted interview, CID personnel instructed the accused to lock up his belongings in a locker. Among the belongings the accused locked up was his cell phone. The accused retained the key to the locker.

d. Prior to the attempted interview that occurred at approximately 1006, SA [KS] properly advised the accused of his Article 31(b) rights for "Cruelty of Subordinates, Forced Sodomy, Rape of an Adult by Force" by using DA Form 3881 and asking the accused to read aloud and initial after each of his rights.

e. The accused invoked his right to counsel and SA [KS] ceased his efforts to question him. The accused did not invoke his right to remain silent.

f. SA [KS] next asked the accused if he would consent to the search of his body to seize DNA evidence, to submit to a physical examination to search for and seize any physical evidence regarding the alleged offenses, as well as a search of his residence and vehicle to seize his clothing and his cell phone. The accused refused SA [KS]'s request for his consent to search and/or seize any of the requested items.

g. SA [KS] then informed the accused that although he had a right to refuse to consent to the search for and potential seizure of these items, that he (SA [KS]) had an obligation to seek a search authorization from a military magistrate to obtain these items. SA [KS] informed the accused that he was going to fill out an affidavit and then go see the magistrate to seek the search authorization. SA [KS] further explained that it would take approximately 45 minutes for him to draft the affidavit, that he then would have to find the magistrate, and go over the affidavit with him. SA [KS] informed the accused that he would have to remain in the interview room while SA [KS] did these things, that afterwards he would be "booked," that SA [KS] would next have to brief the accused's command regarding the investigation, and then arrange for someone from the accused's unit to pick him up. SA [KS] further explained to the accused that while he was waiting for these things to occur, he could not wander through the CID building alone and that if he needed

5

anything such as water or to go to the bathroom, he would need to knock on the door and let someone know.

h. SA [KS]'s purpose for telling the accused all the things that would be transpiring while the accused remained in the interview room was to give the accused an understanding why he was going to be sitting in the room for an extended period that day.

i. Subsequently, SA [KS] departed the interview room, leaving the accused alone. While sitting alone in the room, the accused decided that he would seek out SA [KS] and talk to him about the allegations. As established by his testimony on the Defense's original motion to suppress his statements to SA [KS], the accused's purpose in doing so was to distract SA [KS] from his efforts to search his cell phone, as the accused had previously had [embarrassing] pictures of himself on the phone. The accused was concerned that if his phone was forensically analyzed, these embarrassing photos could be retrieved.

j. Approximately 15 to 30 minutes after SA [KS] departed, the accused stepped out of the interview room and informed SA [G], another CID agent whom the accused encountered, that he had changed his mind and now wanted to talk to SA [KS] about the allegations.

k. SA [G] informed SA [KS] that the accused had approached him and told him he now wanted to talk. A few minutes later, SA [KS] returned to the interview room, where the accused told him that he was now willing to make a statement. When SA [KS] asked him why he had changed his mind, the accused replied, "I know in my heart that I have nothing to hide," or words to that effect.

l. SA [KS] believed it to be unusual that a suspect would change his mind about his invocation of his right to counsel as quickly as the accused had done. Because of this, SA [KS] left the accused in the interview room and went to his boss, Assistant Special Agent-in-Charge (ASAC) [C] to see if it would be permissible to interview the accused subsequent to the accused's initial invocation of his right to counsel. ASAC [C] told SA [KS] that based on the circumstances, SA [KS] could interview the accused, but first had to administer a new rights advisement to the accused and seek a waiver of his rights.

m. At approximately 1119, SA [KS] returned to the interview room and re-advised the accused of his Article 31(b) rights for "Cruelty of Subordinates, Forced Sodomy, Rape of an Adult by

6

Force" by using a second DA Form 3881 and asking the accused to read aloud and initial after each of his rights. The accused waived his rights and so indicated by signing Block 3 under the waiver section of the document.

n. Thereafter, the accused provided oral statements and ultimately, a written and sworn statement, admitting that he had engaged in a consensual sexual encounter with PFC K.L. on 21 October 2012.

o. In his sworn written statement the accused stated that, "I feel in my heart I have nothing to hide," as the reason he wanted to provide a statement without speaking to a lawyer.

p. During all relevant time periods, the accused was under the apprehension of CID. Therefore, he was not free to leave the CID office, and could reasonably believe that he was not free to leave.

AE CXX at 2-5.

### *Conclusions of Law by the Military Judge*

As discussed above, the military judge initially denied the appellee's motion to suppress his oral and written statements to SA KS. AE IL. He concluded that the appellee was not interrogated within the meaning of *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980), and that the *appellee initiated the communication that ultimately led to his waiver* under MILITARY RULE OF EVIDENCE 305, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). AE IL at 8. The military judge focused on the facts surrounding who "initiated further communication" as defined in *Edwards*.[5] He concluded that the appellee initiated the communication with CID and therefore no *Edwards* violation occurred. *Id*. at 8-10.

While the defense's case-in-chief had been continued, the CAAF decided *Hutchins*. Believing that *Hutchins* expanded *Edwards* within the military, the military judge reconsidered his earlier ruling and suppressed the appellee's statement after concluding that:

The *Hutchins* Court held that the "*Edwards* rule does not merely prohibit further interrogation without the

---

[5] *Edwards*, 451 U.S. at 485 (holding that subsequent to an invocation of counsel, the *Edwards per se* rule does not apply if an "accused himself initiates further communication, exchanges, or conversations with the police").

7

benefit of counsel, it prohibits further 'communication, exchanges, or conversations' that may . . . lead to further interrogation.'"  In doing so, the *Hutchins* Court appears to have established a bright line rule, *not limited to the facts of that case*, that after a suspect invoked his right to counsel, a military court must assess whether or not the police opened a more "generalized discussion relating directly or indirectly to the investigation" or instead initiated inquiry related to "routine incidents of the custodial relationship."

AE CXX at 10 (quoting *Hutchins*, 72 M.J. at 298) (emphasis in original)).

The military judge took no additional evidence on the motion, adopted his earlier findings of fact, and largely re-affirmed his prior conclusions of law.  In stating his rationale, the military judge's legal basis for reconsideration relied exclusively on his interpretation of *Hutchins* and its applicability to the appellee's case:

But for the *Hutchins* Court's recent interpretation of the Edwards rule, *which established a bright line rule prohibiting criminal investigators from requesting permission to search from a suspect after he invokes his right to remain silent*, this Court would reaffirm its previous ruling that the accused was the one who initiated further communication with SA [KS], and that . . . the accused's ultimate waiver of his right to counsel was valid as it was knowing and intelligent . . . .

AE CXX at 18(emphasis added).

### III. Jurisdiction, Scope, and Standard of Review

*Jurisdiction*

Both parties agree that we have jurisdiction to act on this interlocutory appeal.  Article 62(a)(1)(B), UCMJ, confers upon this court jurisdiction over Government appeals from orders or rulings by a military judge that "exclude[] evidence that is substantial proof of a fact material in the proceeding."  The legislative history of Article 62 and the CAAF's interpretation of Article 62 establish that Congress intended Article 62 to be

8

applied in the same manner as the Criminal Appeals Act, 18
U.S.C. § 3731.  *United States v. Brooks*, 42 M.J. 484, 486
(C.A.A.F. 1995); *see also United States v. Lincoln*, 42 M.J. 315,
320 (C.A.A.F. 1995).  In other words, Article 62, UCMJ, ensures
that the Government has the same opportunity to appeal adverse
trial rulings that it has in federal civilian criminal
proceedings.  *United States v. Lopez de Victoria*, 66 M.J. 67, 71
(C.A.A.F. 2008).  To invoke jurisdiction under 18 U.S.C. § 3731,
the relevant United States Attorney must certify that a federal
appeal is taken because the evidence excluded is substantial
proof of a material fact.  The military justice system includes
essentially the same requirement.  *See* R.C.M. 908(b)(3).  In
addition, the Judge Advocate General's representative must
decide whether to file the appeal.  R.C.M. 908(b)(6).  Here, we
must determine whether the appellee's statements to SA KS,
standing alone, are "substantial proof of . . . fact[s] material
in the proceeding."  Art. 62(a)(1)(B), UCMJ.  We conclude that
they are.

Admissions of an accused represent a unique source of
strong evidentiary weight.  *See United States v. Wuterich*, 67
M.J. 63, 78 (C.A.A.F. 2008) (recognizing the unique nature of an
accused's admissions).  While the Government had not, at the
time of filing its interlocutory appeal, moved to admit the
appellee's sworn statement (PE 13 for identification), both
parties entered into a stipulation of fact following the
appellee's initial unsuccessful motion to suppress.  In the
stipulation, the appellee admitted to oral and vaginal sex with
KL.  PE 19.[6]  We have no doubt that the appellee would not have
entered into this stipulation had he prevailed on his
suppression motion in the first instance.  Thus, the
certification by the trial counsel and the decision of the Judge
Advocate General's representative to perfect this appeal are
sufficient to invoke jurisdiction as effectively as the
certification of a United States Attorney under the Criminal
Appeals Act.  *See United States v. Scholz*, 19 M.J. 837, 841
(N.M.C.M.R. 1984) (holding that "[i]n an interlocutory appeal,
it is beyond the scope of this Court to speculate as to what
weight or importance a particular piece of evidence might have
at trial").  Accordingly, we conclude we have jurisdiction to
consider this appeal and move to the scope of that review.

---

[6] Additionally, the stipulation contained an acknowledgement that the
appellee's DNA was seized and "maintained in accordance with correct law
enforcement procedures . . . ."  PE 19 at 1-2.  The stipulation was published
to the members on 19 June 2013.  Record at 14 of Vol. VI.

*Article 62(b)*, UCMJ, *Scope of Review*

When reviewing matters under Article 62(b), UCMJ, we act only with respect to matters of law. *United States v. Baker*, 70 M.J. 283, 287-88 (C.A.A.F. 2011) (citing *United States v. Gore*, 60 M.J. 178, 185 (C.A.A.F. 2004)). We may not find additional facts and cannot substitute our own interpretation of the facts. *United States v. Cossio*, 64 M.J. 254, 256 (C.A.A.F. 2007). Thus, we are bound by the military judge's findings unless such findings are clearly erroneous. Findings are "clearly erroneous" when they are not "fairly supported by the record." *Gore*, 60 M.J. at 185 (internal citations and quotation marks omitted). If findings are incomplete or legal issues have not been considered by the military judge, the "'appropriate remedy . . . is a remand for clarification' or additional findings." *United States v. Kosek*, 41 M.J. 60, 64 (C.M.A. 1994).

*Standard of Review: Motion to Suppress*

We review a military judge's ruling on a motion to suppress for an abuse of discretion. *Baker*, 70 M.J. at 287. An abuse of discretion occurs "when: (1) the findings of fact upon which [the military judge] predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citation omitted). But we review the military judge's conclusions of law *de novo*, including his conclusion as to the voluntariness of the statement. *United States v. Chatfield*, 67 M.J. 432, 437 (C.A.A.F. 2009) (citing *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991)) (additional citation omitted). An inquiry into voluntariness assesses "the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *see also United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008).

In suppression motions premised on a lack of voluntary consent, we determine whether consent was voluntary based on all the circumstances. *United States v. Wallace*, 66 M.J. 5, 9 (C.A.A.F. 2008) (citing *Schneckloth*, 412 U.S. at 226-27). The Government bears the burden of demonstrating voluntary consent by clear and convincing evidence. MIL. R. EVID. 314(e)(5).

**IV. Discussion: Issue I**

10

In this case, neither party challenges the military judge's findings of fact as clearly erroneous, but they disagree as to his conclusions of law. After careful consideration, we find the military judge's findings of fact to be supported by the record, not clearly erroneous, and we adopt them.

With regard to the military judge's conclusions of law, the Government asserts that *Hutchins* does not require the suppression of the appellee's statements because, under the facts of this case, the appellee himself initiated further communication with CID. Additionally, the Government asserts that *Hutchins* was limited to its facts and that the military judge erred when he concluded that *Hutchins* announced a bright line expansion of the *Edwards per se* rule.

In *Edwards v. Arizona*, 451 U.S. 477, 485 (1981), the Supreme Court created a bright-line prophylactic judicial rule barring police from interrogating an accused in custody once he clearly asserts his right to counsel, unless an attorney is provided, or "the accused himself initiates further communication, exchanges, or conversations with the police." *See* MIL. R. EVID. 305(g)(2)(B)(i). The purpose of the *Edwards* prophylactic rule is to preserve "the integrity of an accused's choice to communicate with police only through counsel . . . ." *Patterson v. Illinois*, 487 U.S. 285, 291 (1988).

In this case, no attorney was made available to the appellee post-invocation of counsel. Thus, the relevant analysis under *Edwards* is, first, whether CID agents interrogated the appellee post-invocation or whether "the [appellee] himself initiate[d] further communication, exchanges, or conversations" with the agents. *Edwards*, 451 U.S. at 484-85. Second, we must determine whether the appellee subsequently knowingly and intelligently waived his right under the "totality of the circumstances." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983). We conclude -- as did the military judge in his original ruling -- that the appellee himself initiated further communication with SA KS and that the appellee knowingly and intelligently waived his previously asserted right to counsel. Accordingly, we hold that the military judge erred in suppressing the appellee's statements based on his erroneous belief that the holding in *Hutchins* compelled such a result.

A. *The Edwards Rule*

11

Because we conclude that the military judge misinterpreted *Hutchins* in ruling that *Hutchins* expanded the *Edwards* rule in the military, we begin with an analysis of the *Edwards* rule. We then consider the evolutionary trajectory of *Edwards* as interpreted by subsequent Supreme Court cases. Next, we consider cases by our superior court that have interpreted the *Edwards* rule within the military.

To begin our analysis, we move first to the heart of the *Edwards* holding:

> We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Edwards*, 451 U.S. at 484-85.

While subject to a custodial interrogation, Mr. Edwards invoked his right to counsel. Following his invocation, Mr. Edwards was taken to county jail. The next morning (20 January 1976), two detectives sought to speak with Mr. Edwards. Although he replied that he did not want to speak to anyone, the guard told him that "'he had' to talk" to them. *Id*. at 479. Mr. Edwards was again informed of his rights under *Miranda*, waived them, and made an incriminating statement. The Supreme Court concluded that Mr. Edwards had been interrogated post-invocation and that his subsequent waiver was invalid.

In defining the contours of the *Edwards* rule, the Supreme Court emphasized that had Mr. Edwards "initiated the meeting [with the detectives] on January 20," the *Edwards* bar would not have applied. *Id*. at 485. Additionally, the Court stated that "[a]bsent such *interrogation*, there would have been *no* infringement of the right that [Mr.] Edwards invoked and there would be *no* occasion to determine whether there had been a valid waiver." *Id*. at 486 (emphasis added).

Two years later, the Supreme Court analyzed the *Edwards* rule within the context of a defendant-initiated communication with the police post-invocation of counsel. In *Oregon v. Bradshaw*, a four-Justice plurality emphasized the phrase "communication, exchanges, or conversations" from *Edwards* and specifically linked it to the actions of the defendant, Mr.

12

Bradshaw, *not* the police.[7]  This contextual link between the above phrase in *Edwards* and Mr. Bradshaw's conduct animates the *Bradshaw* holding that Mr. Bradshaw himself initiated communication with the police.  To provide clarity to this concept, the *Bradshaw* plurality again quoted to *Edwards*:

> If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be 'interrogation.'  In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, *whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities*.

*Id*. at 1044-45 (quoting *Edwards*, 451 U.S. at 486 n.9 (emphasis added)).

Because *Bradshaw* was a plurality opinion, we believe it important to consider Justice Powell's concurrence.  *See generally Marks v. United States*, 430 U.S. 188, 193 (1977) (holding that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taking by those Members who concurred in the judgments on the narrowest grounds")(citation and internal quotation marks omitted).  In *Bradshaw*, eight Justices -- four in the plurality and four dissenters -- subscribed to the view that *Edwards*-type cases require a two-step analytical framework (step (1): whether there was police-initiated *interrogation* or accused-initiated communication post-invocation of counsel and step (2): whether the subsequent waiver was knowing and intelligent under "the totality of the circumstances").  Justice Powell was the lone Justice who rejected the two-step approach.[8]  Because eight

---

[7] "We further hold that *an accused, such as [the defendant], having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police*."  *Bradshaw*, 462 U.S. at 1043 (quoting *Edwards*, 451 U.S. at 484-85 (footnote omitted) (emphasis added)).

[8] In *Edwards*, Justice Powell concurred in the result, but did not join the Court's opinion because he "was not sure what it mean[t]".  *Edwards*, 451 U.S. 488 (Powell, J., concurring in the result).  In *Bradshaw*, Justice Powell

13

Justices in *Bradshaw* adopted the *Edwards* two-step analytical approach, we need not determine whether Justice Powell's rationale is broader or narrower than the plurality view.

Nevertheless, Justice Powell's concurrence in *Bradshaw* is illuminating on the "meaning of 'initiation'" as the central issue in that case. *Id*. at 1048 (Powell, J., concurring in the judgment). The analytical fulcrum point in *Bradshaw* centered squarely on the words of Mr. Bradshaw, *not* the police. According to Justice Powell, the principal difference between the four-Justice plurality and the four-Justice dissent in *Bradshaw* dealt with Mr. Bradshaw's post-invocation communication to police, "what is going to happen to me now?" *Id*. at 1049. The four-Justice plurality concluded that Mr. Bradshaw's question "evinced a willingness and a desire for a generalized discussion about the investigation," *id*. at 1045-46, while the four-Justice dissent would require that an accused not only initiate the communication, but also that the communication be "about the subject matter of the criminal investigation." *Id*. at 1053 (Marshall, J., dissenting).

The Supreme Court has revisited the *Edwards* rule multiple times since *Bradshaw*. In *Arizona v. Roberson*, 486 U.S. 675 (1988), the Court took another opportunity to interpret the prophylactic contours of the *Edwards* rule. In *Roberson*, six Justices joined the opinion of the Court holding that the *Edwards* rule extends to post-invocation interrogation even if the subject matter of the interrogation concerns a separate offense unrelated to the initial investigation. *Id*. at 677. Although not central to the holding in *Roberson*, the Court quoted *Edwards* within the context of an accused-initiated communication post-invocation: "[a]s we have made clear, any 'further communication, exchanges, or conversations with the police' that the *suspect himself initiates*, *Edwards v. Arizona*, 451 U.S. at 485, *are perfectly valid*." *Roberson*, 486 U.S. at 687 (emphasis added).

*In Arizona v. Mauro*, 481 U.S. 520 (1987), the Supreme Court considered the *Edwards* rule within the context of police conduct that did not involve direct questioning. Suspected of killing his son, Mr. Mauro invoked his right to counsel and questioning ceased. Mrs. Mauro was being questioned in another room. She

---

advocated a one-step "totality of the circumstances" approach because he believed courts "should engage in more substantive inquiries than 'who said what first.'" *Bradshaw*, 462 U.S. at 1051 (Powell, J., concurring in the judgment).

asked whether she could speak with her husband.  The police officer agreed, but insisted on being present in the room.  The Arizona Supreme Court concluded that the police conduct constituted an interrogation and suppressed Mr. Mauro's admissions he had made during the exchange with his wife.  The Supreme Court (five Justices) reversed, concluding that even though the police "were aware of the possibility" that Mr. Mauro may incriminate himself, the Supreme Court held that because he "was not subjected to compelling influences, psychological ploys, or direct questioning" he was not interrogated as a matter of law.  *Id*. at 528-29.

In *Minnick v. Mississippi*, 498 U.S. 146 (1990), the Supreme Court (six Justices) extended the *Edwards* rule to prohibit police from "reinitiate[ing] interrogation without counsel present, whether or not the accused has consulted with his attorney."  *Id*. at 153.  Writing for the Court, Justice Kennedy repeatedly stated that the prophylactic protections of *Edwards* and its progeny apply only within the context of "police-initiated interrogation."  *Id*.  In this regard, the Court made it clear that if an accused himself initiates the conversation post-invocation of counsel, the *Edwards* rule does *not* apply: "*Edwards* does not foreclose finding a waiver of *Fifth Amendment* protections after counsel has been requested, provided the accused has initiated the conversation or discussions with the authorities . . . ." *Id*. at 156.

In *Montejo v. Louisiana*, 556 U.S. 778, 795 (2009), the Supreme Court explicitly overruled *Michigan v. Jackson*, 475 U.S. 625 (1986), which had held that the *Edwards* rule applied to the Sixth Amendment.  In defining the prophylactic parameters of *Edwards*, the Court re-emphasized that the "*Miranda-Edwards* regime" does not apply to "noninterrogative types of interactions between the defendant and the State . . . ."  *Id.* The Court in *Montejo* contextualized the *Edwards* rule by looking to its purpose: to preclude police "from badgering defendants into waiving their previously asserted rights," *id*. at 794 (citations omitted), counterbalanced with the "unmitigated good" of "obtain[ing] uncoerced confessions,"  *id*. at 796 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 181 (1991)).

In *Maryland v. Shatzer*, 559 U.S. 98, 105 (2010), the Supreme Court clarified that the *Edwards* rule is not constitutionally-based, but rather a judicially-created prophylaxis.  Accordingly, a near unanimous Supreme Court held that the protection afforded under the *Edwards* rule, to the extent it creates a presumption of an invalid waiver under

15

*Miranda*, is extinguished 14 days following an invocation of the right to counsel.  *Id*. at 110.

Within the military, our superior court considered the *Edwards* rule in *United States v. Harris*, 19 M.J. 331 (C.M.A. 1985).  In *Harris*, Chief Judge Everett exhaustively analyzed the *Edwards* rule in terms of whether Private Harris "'initiated' a discussion with" law enforcement.  *Id*. at 338.  The *Harris* Court cited *Solem v. Stumes*, 465 U.S. 638 (1984), which held that the *Edwards* rule -- because it is a judicially-created prophylactic rule -- did not have retroactive application.  On the issue of initiation post-invocation, the *Harris* Court emphasized the *Stumes* holding: "*Edwards established a new test for when that waiver would be acceptable once the suspect had invoked his right to counsel: the suspect had to initiate subsequent communication*."  *Harris*, 19 M.J. at 337 (quoting *Stumes*, 465 U.S. at 646).

Since *Harris*, the CAAF and its predecessor court have interpreted the applicability of the *Edwards* rule to fit military practice;[9] however, clarity vis-à-vis initiation has remained consistent.  Within the context of what constitutes "initiation," our superior court has consistently expressed the test as one focused on an accused-initiated communication.  *See e.g. Coleman*, 26 M.J. 451, 452 (C.M.A. 1988) (*per curiam*) (holding that *Edwards* precludes further interrogation "unless he [the accused], himself, initiates further communications); *United States v. Delarosa*, 67 M.J. 318, 320 (C.A.A.F. 2009) (citing *Edwards* and stating that a suspect who invokes his right to counsel may not be further interrogated "unless the suspect himself reinitiated further communication with the police").

---

[9] In *United States v. Reeves*, 20 M.J. 234 (C.M.A. 1985), the Court of Military Appeals (CMA) expanded the applicability of the *Edwards* rule to apply to interrogative conduct by a non-law enforcement commander; *see United States v. Brabant*, 29 M.J. 259, 263 (C.M.A. 1989) (concluding that Sergeant Brabant's commanding officer's order that Sgt Brabant attend a meeting following his invocation of counsel created the "functional equivalent of a 'reinitiation of interrogation'"); *see also United States v. Mitchell*, 51 M.J. 234, 237 (C.A.A.F. 1999) (extending applicability of *Edwards* to question, "Was it worth it" by Petty Officer Mitchell's leading chief petty officer who was there as part of official command brig visit).  The CMA has also created an overseas exception to the *Edwards rule*.  *United States v. Vidal*, 23 M.J. 319 (C.M.A. 1987); *see United States v Coleman*, 26 M.J. 451, 453 (C.M.A. 1988) (holding that a request for counsel made to foreign authorities is insufficient to trigger *Edwards* rule even if Army CID agents were aware of Specialist Coleman's prior request for counsel made to German police).

16

The Court of Military Appeals (CMA) had occasion to analyze the meaning of "initiation" in *United States v. Reeves*, 20 M.J. 234 (C.M.A. 1985). Upon being informed of his rights by a CID agent, PFC Reeves requested counsel and the CID agent terminated the interview. Later that day, when PFC Reeves was being in-processed for pretrial confinement, his company commander went to see PFC Reeves and "talk to [him]." *Id*. at 235. The CMA held that PFC Reeves's company commander had interrogated PFC Reeves; however, the CMA remanded the case to the lower court as to whether PFC Reeves "initiated" the conversation with the company commander, which if true, "would [make PFC Reeves's statements] admissible." *Id*. at 237 (citing *Bradshaw*);[10] *see United States v. Jordan*, 29 M.J. 177, 191 (C.M.A. 1989) (stating that "a suspect who is in custody and has requested counsel cannot be interrogated unless and until he has 'initiated' a discussion") (Everett, C.J., dissenting) (citations omitted); *see also United States v. Watkins*, 34 M.J. 344, 347 (C.M.A. 1992) (plurality) (stating that Specialist Watkins, after having invoked his right to counsel, "initiated the subsequent exchange by asking the agent whether he preferred military or civilian counsel and how much punishment [he] was facing").

## B. *Hutchins and Application of the Edwards Rule*

In *Hutchins*, the CAAF applied a unique set of facts in finding an *Edwards* violation.[11] Sergeant (Sgt) Hutchins was suspected of being the ring-leader in the killing of an Iraqi civilian on 26 April 2006 during counter-insurgency operations in Hamdaniyah, Iraq. On 11 May 2006, Naval Criminal Investigative Service (NCIS) agents interrogated Sgt Hutchins. He initially described the killing as a "good shoot," but when told that one member of his squad had confessed to the killing having been unlawful and premeditated, Sgt Hutchins invoked his right to counsel and NCIS agents terminated the interrogation. *United States v Hutchins*, No. 200800393, 2012 CCA LEXIS 93 at *28-29 (N.M.Ct.Crim.App. 20 Mar 2012), *reversed and remanded*, 72 M.J. 294 (C.A.A.F. 2013). Following his invocation, Sgt

---

[10] Upon remand, the U.S. Army Court of Military Review concluded that the Government had "failed to establish by a preponderance of the evidence that [PFC Reeves] initiated the conversation with his company commander." *United States v. Reeves*, 21 M.J. 391, 392 (C.M.A. 1985) (appendix). The CMA agreed and set aside the findings and sentence. *Id*. at 391 (summary disposition).

[11] For purposes of a full factual rendition, we cite to both the CAAF opinion and our opinion in *Hutchins*, *United States v. Hutchins*, No. 200800393, 2012 CCA LEXIS 93 (N.M.Ct.Crim.App. 20 Mar 2012), *reversed and remanded*, 72 M.J. 294 (C.A.A.F. 2013).

Hutchins was "confined to a trailer under guard." *Hutchins*, 72 M.J. at 296-97. He was able to "meet with the chaplain and use the head and shower facilities outside the trailer, but was not allowed to use MWR facilities, telephones, computers, the postal service or other methods of communication." *Hutchins*, 2012 CCA LEXIS 93 at *29.

On 18 May 2006, NCIS agents approached each member of the squad to request permissive authorization to search. The same NCIS agent who had previously interrogated Sgt Hutchins entered his trailer and asked him whether he would consent to a search of his belongings. During this interaction, Sgt Hutchins asked the NCIS agents "if the door was still open to tell his side of the story." *Id*. at *30. The lead NCIS investigator replied that he could not speak to him because of his earlier invocation of counsel. Sgt Hutchins replied "that he wanted to speak with the agents and did not need an attorney." *Id*. Nevertheless, the NCIS agents declined to speak with Sgt Hutchins that evening. The next day, the NCIS agent brought Sgt Hutchins to the NCIS agents' trailer. He was fully advised of his Article 31(b) rights, waived them, and "typed a detailed confession." *Id*.

In finding an *Edwards* violation and setting aside Sgt Hutchins's conviction, the CAAF held that under the circumstances, Sgt Hutchins's statement "was a direct result of the reinitiation of communication by NCIS" as interpreted by *Edwards* and *Bradshaw*. *Hutchins*, 72 M.J. at 299.

### C. *Application of Edwards to the Appellee's Case*

In this case, the military judge found, and both parties agree, that the appellee was subject to a custodial interrogation and that he invoked his right to counsel, thus triggering the *Edwards* rule. We agree. To determine, however, whether there was an *Edwards* violation, we proceed to the first step under *Edwards*: whether SA KS's communication with the appellee post-invocation of counsel -- but prior to the appellee's subsequent waiver -- constituted an interrogation. *Edwards*, 451 U.S. at 484; MIL. R. EVID. 305(e)(1).

### *Did SA KS's Communication Constitute an Interrogation?*

For purposes of this Article 62, UCMJ, appeal, we review *de novo* the question of whether SA KS's communication with the appellee post-invocation of counsel constituted an interrogation. *Kosek*, 41 M.J. at 63. The military judge ruled

18

that SA KS's request for consent to search did not constitute an interrogation.  AE CXX at 14.  We agree.

A request to consent to search does not constitute an interrogation.  *See United States v. Burns*, 33 M.J. 316, 320 (C.M.A. 1991) (holding that "[b]ecause consent is not a statement and a request for consent is not an interrogation, giving consent to search is a neutral fact which has no tendency to show that the suspect is guilty of any crime") (citation and internal quotation marks omitted); *United States v. Roa*, 24 M.J. 297, 299 (C.M.A. 1987) (stating that since a "request for consent to search . . . is not interrogation . . . the consent thereby given is not a statement"); *see also United States v. Cooney*, 26 Fed.Appx. 513, 523 (6th Cir. 2002) (noting that there is unanimous agreement within the federal circuits that "consenting to a search is not an incriminating statement under the Fifth Amendment because the consent is not evidence of a testimonial or communicative nature") (citations omitted).

Here, following the appellee's refusal to consent, SA KS explained that he was going to request a search authorization from a magistrate.  The military judge concluded that this explanation by its nature was non-interrogative.  We agree. "'[I]nterrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response . . . ."  *Innis*, 446 U.S. at 301 (footnote omitted).  MIL. R. EVID. 305(b)(2) defines "interrogation" as "any formal or informal questioning in which an incriminating response either is sought or is a reasonable consequence of such questioning."

The military judge found that SA KS's purpose for explaining to the appellee that he would "seek a search authorization," was to ensure that the appellee understood "why he was going to be sitting in the room for an extended period." AE CXX at 3-4.  This finding was supported by the record and SA KS's explanation was made for a proper purpose.  *See United States v. McClain*, 31 M.J. 130, 133 (C.M.A. 1990) (stating that "[a]n official seeking consent from a servicemember may explain that he will attempt to obtain from an appropriate commander or military judge a search authorization").  This was a one-way communication with the appellee that neither sought a response, nor was it "reasonably likely to elicit an incriminating response from the [appellee]."  *Innis*, 446 U.S. at 301.

19

Having concluded that neither SA KS's request for consent to search nor his subsequent explanation that he would seek a search authorization constituted an interrogation, we move to the next step in the *Edwards* analysis: whether the appellee himself initiated communication with CID agents regarding the subject matter of the criminal investigation. Prior to doing so, however, we must evaluate the military judge's determination that *Hutchins* created a new *per se* rule that mandated suppression of the appellee's oral and written statements.

## Did Hutchins Expand the Edwards Per Se Rule?

The military judge ruled that *Hutchins* expanded the *Edwards* rule to *per se* prohibit "criminal investigators from requesting permission to search from a suspect after he invokes his right" to counsel. AE CXX at 18. Specifically, the military judge focused on the following sentence from *Hutchins*:

> The *Edwards* rule does not merely prohibit further interrogation without the benefit of counsel, it prohibits further "communication, exchanges, or conversations" *that may . . . lead to further interrogation*.

*Id.* at 10 (emphasis added) (quoting *Hutchins*, 72 M.J. at 298).

The military judge's interpretation, however, raises two separate yet related *per se* rules. The broader *per se* rule appears to stand for the proposition that *all* law enforcement-initiated communication -- following invocation of counsel -- violates *Edwards*, if the subject matter of the communication relates directly or indirectly to the investigation. The narrower *per se* rule, subsumed within the broader one, and the one that caused the military judge to reconsider his ruling based solely on *Hutchins*, stands for the proposition that *all* law enforcement requests for consent to search following invocation of counsel violate *Edwards*. Based on our analysis of *Hutchins*, we address each in turn.

We do not interpret *Hutchins* as having created an expanded *per se* prophylactic rule within the military. Rather, we interpret the CAAF as having applied *Edwards* and *Bradshaw* to the unique facts in *Hutchins*.[12] We find additional support for our

---

[12] "We hold that the NCIS request to Hutchins for his consent to search reinitiated communication with Hutchins in violation of his Fifth Amendment rights as interpreted by the Supreme Court in *Edwards* . . . and *Bradshaw* . . . ." *Hutchins*, 72 M.J. at 295-96; *see also id.* at 299-300 (stating that NCIS

interpretation based on prior opinions in which the CAAF created a "new rule" within the military and did so explicitly.  *See, e.g., United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006) (creating "new rule" for purposes of timely post-trial processing); *United States v. Chatman*, 46 M.J. 321, 323-24 (C.A.A.F. 1997) (establishing "new rule" to require "colorable claim of possible prejudice" in certain types of alleged post-trial processing errors).

Even if the CAAF did not announce a new *per se* rule, we are still required to give every sentence in the *Hutchins* opinion its full effect.  Thus, we must decide whether the particular sentence in *Hutchins* that the military judge considered critical to his analysis ("The *Edwards* rule . . . prohibits further 'communication, exchanges or conversations' that may . . . lead to further interrogation") is dictum or part of its core holding.[13]  *See generally United States v. Winckelmann*, 73 M.J. 11 (C.A.A.F. 2013) (stating that if particular words in a Supreme Court opinion are part of its core holding, the CAAF "is required to follow" it) (Stucky, J., concurring in the result).  If this particular sentence is part of *Hutchins's* core holding, we are required to follow it, or distinguish it.  *See United States v. Allbery*, 44 M.J. 226, 228 (C.A.A.F. 1996) (holding that courts of criminal appeals must follow CAAF precedent regardless of circumstances).

Admittedly, it is at first glance difficult to ascertain whether that particular sentence is part of the core holding in *Hutchins*.  Adding to our analytical challenge is the fact that with one exception,[14] the CAAF does not rely on or analyze its prior *Edwards*-type cases.  Additionally, the CAAF does not cite to the President's interpretation of the waiver provision of the

---

reinitiated with Sgt Hutchins in violation of his rights "as interpreted by the Supreme Court in *Edwards* . . . and *Bradshaw*").

[13] "The *Edwards* rule does not merely prohibit further interrogation without the benefit of counsel, it prohibits further 'communication, exchanges, or conversations' that may (and in this case, did) lead to further interrogation."  *Hutchins*, 72 M.J. at 298 (quoting *Edwards*, 451 U.S. at 485).

[14] The CAAF cites to *United States v. Applewhite*, 23 M.J. 196, 199 (C.M.A. 1987).  *Hutchins*, 72 M.J. at 299 n.8.  We do not find *Applewhite* particularly instructive on what constitutes an "initiation" following invocation of counsel.  Following Sgt Applewhite's invocation of his right to counsel, the CID agent requested that Sgt Applewhite submit to a polygraph examination.  A post-invocation polygraph examination would be a violation of *Edwards* since a polygraph examination by its nature is interrogative.

21

*Edwards* rule.  MIL. R. EVID. 305(g)(2)(B).[15]  Accordingly, we are left with the balance of the words in the opinion and the only two cases upon which the CAAF relied, *Edwards* and *Bradshaw*.

Given the broad interpretation relied upon by the military judge, this particular sentence from *Hutchins* effectively prohibits all post-invocation admissions by an accused if the police engage in any conversation following an accused's invocation.  But the CAAF has never foreclosed all law enforcement comment following an accused invocation of his right to counsel.  *See United States v. Young*, 49 M.J. 265, 267 (C.A.A.F. 1998) (stating that there is "no blanket prohibition against a comment or a statement by a police officer after an invocation of rights").[16]

To inform our analysis further, we evaluate the analytical origin of that particular sentence in *Hutchins*.[17]  We believe that sentence was extrapolated from two sentences in *Bradshaw*.  462 U.S. at 1045.  While we are unclear of the origin of such an extrapolation, we do note that neither of these two sentences goes to the core of the Supreme Court's holding in *Bradshaw* with regard to who initiated the communication.[18]  There was no doubt

---

[15] A "waiver of the right to counsel obtained during a custodial interrogation concerning the same or different offenses is invalid unless the prosecution can demonstrate by a preponderance of the evidence that -- (i) the accused or suspect initiated the communication leading to the waiver . . . ."  MIL. R. EVID. 305(g)(2)(B).

[16] In *Young*, the CAAF suggested that SA S's parting shot comment following Sgt Young's invocation of counsel, "I want you to remember me, and I want you to remember my face, and I want you to remember that I gave you a chance," was not the functional equivalent of an interrogation and did not constitute reinitiation on the part of the SA S.  *Young*, 49 M.J. at 266-67; *see also United States v. Payne*, 954 F.2d 199, 203 (4th Cir. 1992) (rejecting Mr. Payne's argument that "statements by law enforcement officials regarding the nature of the evidence against the suspect constitute interrogation as a matter of law").

[17] "The *Edwards* rule does not merely prohibit further interrogation without the benefit of counsel, it prohibits further 'communication, exchanges, or conversations' that may (and in this case, did) lead to further interrogation."  *Hutchins*, 72 M.J. at 298 (quoting *Edwards*, 451 U.S. at 485).

[18] The phrase "communication, exchanges, or conversations" is a direct quote from *Edwards* (451 U.S. at 485); however, based on our contextual analysis of *Hutchins*, the conclusion that the CAAF drew ("*Edwards* . . . prohibits further "communication, exchanges, or conversations that may . . . lead to further interrogation") appears to have its genesis in the following two sentences from *Bradshaw*:

> There are some inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they

Mr. Bradshaw initiated the communication.  The issue before the Court was whether the nature of Mr. Bradshaw's communication ("well, what is going to happen to me now") was sufficiently particularized to "open up a more generalized discussion relating directly or indirectly to the investigation." *Bradshaw*, 462 U.S. at 1045.  The principal disagreement between the plurality and the dissent was whether Mr. Bradshaw's communication constituted initiation as a matter of law for purposes of *Edwards*.  A plurality of the Court concluded that Mr. Bradshaw's communication "open[ed] up a more generalized discussion" about the case and with Justice Powell's vote concurring in the judgment, the Court reversed the Arizona Supreme Court.  *Bradshaw*, 462 U.S. at 1046-47.  But nothing in these two sentences from *Bradshaw* relied upon by the CAAF in *Hutchins*, focused on police-initiated communication.

We find additional support within *Bradshaw* that the plurality was primarily focused on accused-initiated communication.  The only two examples specifically cited by the plurality as insufficient for purposes of initiation -- a request for a drink of water or a request to use the telephone -- were specifically linked to accused-initiated communication. *Bradshaw*, 462 U.S. at 1045 ("There are some inquires, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire *on the part of the accused* to open up a more generalized discussion relating directly or indirectly to the investigation.") (emphasis added).  We believe these two examples cited by the plurality are in response to Justice Marshall's dissent that Mr. Bradshaw's communication ("[w]ell what's going to happen to me now?") was not specific enough to initiate a conversation because it did not sufficiently relate to "*the subject matter of the criminal investigation*."  *Id*. at 1053 (Marshall, J., dissenting).  We base our belief on the facts in *Bradshaw*, the plurality opinion (conceding that Mr. Bradshaw's statement was ambiguous), and Justice Powell's

---

> cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation.  Such inquires or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally "initiate" a conversation in the sense in which that word was used in *Edwards*.

*Bradshaw*, 462 U.S. at 1045.  However, the latter phrase from that sentence in *Hutchins* ("that may . . . lead to further interrogation") does not appear in this section of *Bradshaw*.

23

concurrence, without which the holding in *Bradshaw* cannot be sustained.

Having concluded that the aforementioned sentence in *Hutchins* is extrapolated from *Bradshaw*, we next analyze the broader implications of the military judge's interpretation of that particular sentence in Hutchins. Particularly nettlesome is the word "may" in that sentence ("*Edwards* rule prohibits . . . further 'communication, exchanges or conversations' that may . . . lead to further interrogation") because if one gives "may" its broadest application to all *Edwards*-type scenarios as the military judge did, any police-initiated conversation -- regardless of its subject matter -- that precedes a later interrogation, forecloses any bona fide attempt by an accused to "open up a more generalized discussion relating directly or indirectly to [an] investigation." *Bradshaw*, 462 U.S. at 1045.

We do not believe that our superior court in *Hutchins* intended such an expansive use of the word "may" to foreclose all police-initiated conversation that takes place post-invocation of counsel. With the exception of that one sentence, nowhere else within the opinion does the CAAF suggest that all police-initiated communication that occurs following invocation of counsel will violate *Edwards*. *Hutchins*, 72 M.J. at 298 (stating that "[n]ot all communications initiated by . . . law enforcement will trigger the protections under *Edwards*"). Indeed, such an interpretation could lead to undesirable and absurd results. For example, a police officer's offer to a suspect for a drink of water could foreclose any ensuing reply that otherwise would constitute a valid attempt to initiate a conversation on the part of the suspect. Additionally, such an expansive meaning of the word "may" could void good-faith attempts on the part of law enforcement to apply the *Edwards* rule under MIL. R. EVID 305(g).

Rather than focusing on one particular sentence, we believe that the better approach is to consider the entire opinion in context in an attempt to gain a better understanding of what the *Hutchins* court meant by its use of the word "may" within that sentence. In this regard, we interpret "may" to stand for the general proposition that there may be certain factual circumstances, like in *Hutchins*, where law enforcement-initiated communication, short of interrogation, "may" violate *Edwards*.

Having concluded that within the broader context, the CAAF did not intend *Hutchins* to stand for the general proposition that all police-initiated communication following invocation of

24

right to counsel *per se* violates *Edwards*, we move to the narrower question: did *Hutchins* create a *per se* rule that *all* requests for consent to search that take place following an accused's or suspect's invocation of counsel violate the *Edwards* rule?

To address this narrower question, we look to the entire opinion in *Hutchins* and find no indication that the CAAF intended *Hutchins* to be read as broadly as the military judge did. Instead, we interpret *Hutchins* to apply a unique set of circumstances to conclude that Sgt Hutchins's rights under *Edwards* were violated. *Hutchins*, 72 M.J. 298 n.5 (stating that "[i]t is hard to imagine a situation where [application of *Miranda* and *Edwards*] would be more of a concern than in the present case" (e.g., held essentially in solitary confinement within a combat zone of a foreign country, without access to an attorney, "a phone, the mail system, or other means of communication"). Key to the *Hutchins* holding was the CAAF's articulation that under the circumstances "[t]*his* request for consent to search," *Id*. at 299, triggered *Edwards* protections and not all requests for consent to search "implicate the Fifth Amendment." *Id*. at n.9 (emphasis added). In fact, the CAAF seemed to suggest that under the right circumstances, a "simple request for consent to search" may not trigger *Edwards*. *Id*. at n.10.

Because we conclude that the CAAF applied the facts in *Hutchins* to *Edwards* and *Bradshaw* rather than announcing a new *per se* prophylactic expansion of the *Edwards* rule, we apply the facts of this case to *Edwards* and its Supreme Court progeny, and in doing so easily distinguish them from *Hutchins*. Accordingly, we move next to consider whether the appellee initiated further communication for *Edwards* purposes.

## *Did the Appellee Initiate Communication Under Edwards?*

In the thirty-two years since *Edwards*, the Supreme Court has never extended the *Edwards* prophylactic rule to bar non-interrogative interaction between police and a suspect following that suspect's request for counsel. Instead, initiation of a conversation or dialogue between police and an accused post-invocation of counsel has focused on two distinct questions: (1) whether the police interrogated the accused post-invocation, or (2) whether "the accused himself initiate[ed] further

25

communication, exchanges, or conversations with the police."[19] *Edwards*, 451 U.S. at 485.

Having concluded that the CAAF in *Hutchins* did not intend to establish a new bright-line *per se* rule expanding the *Edwards* rule beyond its well-established parameters, we next analyze the facts of this case as distinguishable from the unique facts in *Hutchins*. The most significant distinction between *Hutchins* and this case is that the appellee's interaction with SA KS consisted of two discrete transactions for purposes of evaluating *Edwards*.

Unlike the facts in *Hutchins*, in which the request for consent to search and Sgt Hutchins's statement ("is it too late to give my side of the story") blended into one continuum, here there was a significant break of 15 to 20 minutes between the appellee effectively ending SA KS's interrogative attempt and the appellee's subsequent change-of-heart. *Cf. Bobby v. Dixon*, 132 S.Ct. 26, 31-32 (2011) (per curiam) (holding that based on passage of four hours between Mr. Dixon's un-coerced yet unwarned statement and his subsequent *Mirandized* statement, his subsequent statement was admissible and distinguishable from *Missouri v. Siebert*, 542 U.S. 600, 661 (2004) because in *Siebert* the "unwarned and warned interrogations blended into one continuum").

It was during these 15 to 20 minutes -- while sitting alone in the interview room -- that the appellee unilaterally decided to provide a statement regarding the accusations against him because he had "nothing to hide." PE 13 at 4. Specifically, the appellee, on his own initiative, left the interview room, found SA G and asked him to locate SA KS and inform him that the appellee now wanted to provide a statement. SA KS again re-advised the appellee of his Article 31(b) rights and the

---

[19] We have been unable to find any Supreme Court case that references the *Edwards* rule and quotes the phrase "communication, exchanges, or conversations" without also linking that particular phrase to actions by the accused. *See Berghuis v. Thompkins*, 560 U.S. 370, 407 (2010) (Sotomayor, J., dissenting); *Shatzer*, 559 U.S. at 104; *Minnick*, 498 U.S. at 150; *Butler v. McKellar*, 494 U.S. 407, 420 (1990) (Brennan, J., dissenting in part); *Patterson*, 487 U.S. at 291; *Roberson*, 486 U.S. at 680-81; *Mauro*, 481 U.S. at 526 (1987); *Connecticut v. Barrett*, 479 U.S. 523, 535 (1987) (Brennan, J., concurring in the judgment); *Watkins v. Virginia*, 475 U.S. 1099, 1100 (1986) (Marshall, J., dissenting from the denial of *certiorari*); *Jackson*, 475 U.S. at 626, *overruled by Montejo*, 556 U.S. at 795; *Shea v. Louisiana*, 470 U.S. 51, 55 (1985); *Bradshaw*, 462 U.S. at 1043; *Wyrick v. Fields*, 459 U.S. 42, 46 (1982); *Johnson v. Virginia*, 454 U.S. 920, 920 (1981) (Marshall, J., dissenting from denial of *certiorari*).

appellee waived his right to counsel and to remain silent.  AE CXX at 4-5.  Unlike the unique facts in *Hutchins*, the record is clear in this case that the appellee -- while sitting alone in the interview room devoid of external pressure by law enforcement -- decided to initiate further communication with SA KS after his invocation of counsel.  That communication "evinced a willingness and a desire for a generalized discussion about the investigation."  *Bradshaw*, 462 U.S. at 1045-46.[20]

Assuming *arguendo* that the 15-20 minute interval between KS's request for consent and the appellee's subsequent unilateral change-of-heart is insufficient to make it legally distinct from *Hutchins* for purposes of *Edwards*, we find that the military judge's interpretation of *Hutchins* as a *per se* expansion of *Edwards* is flawed for several reasons.  First, such an expansion, *per se* barring SA KS's request for consent to search -- a non-interrogative event -- conflicts with subsequent Supreme Court cases interpreting the *Edwards* rule.  *See, e.g., Montejo*, 556 U.S. at 795 (holding that the "*Miranda-Edwards* regime . . . [does not] govern . . . noninterrogative types of interactions between the defendant and the State . . .").

---

[20] Federal circuits that have considered scenarios in which there is a temporal break between invocation and subsequent initiation have uniformly held that there was no *Edwards* violation.  *See McKinney v. Ludwick*, 649 F.3d 484, 491 (6th Cir. 2011) (holding that even if a detective's statement -- that the case might be prosecuted by the federal government and that Mr. McKinney could face the death penalty -- made to Mr. McKinney post-invocation amounted to interrogation, McKinney's decision the next morning to flag down the detective from his cell constituted initiation for purposes of *Edwards*), *cert. denied*, 132 S. Ct. 1559 (2012); *Savino v. Murray*, 82 F.3d 593, 599-600 (4th Cir. 1996) (stating that a "defendant who ends police-initiated interrogation by requesting counsel, then specifically calls for an officer with whom to talk about the incident in question, has reinitiated further conversation for *Edwards* purposes"); *United States v. Velasquez*, 885 F.2d 1076, 1085-86 (3d Cir. 1989) (holding that following her invocation of counsel, Mrs. Velasquez's request to police officer to get federal investigator because she wanted to speak with him, her subsequent question to the federal investigator ("What is going to happen"), initiated the conversation and satisfied first step in *Bradshaw*); *McCree v. Housewright*, 689 F.2d 797, 802 (8th Cir. 1982) (holding that following his invocation of counsel when Mr. McCree subsequently knocked on his cell door and stated he had something to say, this constituted initiation under *Edwards*); *see also United States v. Comosona*, 848 F.2d 1110, 1112-13 (10th Cir. 1988) (holding that following his invocation of counsel, FBI Agent handed Mr. Comosona a business card and invited him to call collect if he wanted to talk about incident whereupon Mr. Comosona stated that he wanted to continue the interview constituted initiation by Mr. Comosona within the meaning of *Edwards*).

Second, taken to its logical conclusion, virtually any non-interrogative "communication, exchange[], or conversation[]," on the part of law enforcement post-invocation of counsel could create a permanent bar to further interrogation regardless of an accused's desire to initiate a conversation with law enforcement. Indeed, a request for consent to search -- clearly a non-interrogative exchange -- interposed post-invocation of counsel, would bar subsequent initiation on the part of an accused. It would also call into question other routine non-interrogative law enforcement procedures such as compelling an accused to submit a blood sample, a hand-writing exemplar, or a voice exemplar, which by their very nature would relate, at least indirectly, to the investigation. The Supreme Court has long held that it offends no notion of the Fifth Amendment for police to compel an accused to provide a blood sample, *Schmerber v. California*, 384 U.S. 757 (1966), a hand-writing exemplar, *Gilbert v. California*, 388 U.S. 263 (1967), or a voice exemplar, *United States v. Wade*, 388 U.S. 218 (1967). It strikes us as illogical that compelling an accused to submit to these procedures would not violate the Fifth Amendment; whereas under the military judge's logic, a police request for consent to these same procedures following an invocation of counsel, forecloses any attempt by an "accused himself [to] initiate[] further communications, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-85.

Third, the military judge's interpretation would significantly dim the clarity of the *Edwards* rule, which has repeatedly been praised for providing "'clear and unequivocal' guidelines to the law enforcement profession." *Roberson*, 486 U.S. at 682; *see Minnick*, 498 U.S. at 151 (stating that the "merit of the *Edwards* decision lies in the clarity of its command and the certainty of its application"). Additionally, it would call into question the continued validity of MIL. R. EVID. 305(g)(2)(B)(i), something that *Hutchins* does not suggest.

Finally, the military judge's broad application of the *Edwards* rule would put it at odds with its intended purpose. The purpose of the *Edwards* rule is to "'prevent police from badgering a defendant into waiving his previously asserted'" request for counsel. *Minnick*, 498 U.S. at 150 (quoting *Michigan v. Harvey*, 494 U.S. 344, 350 (1990); *see also Young*, 49 M.J. at 267 (stating that "*Edwards* is designed to prevent the police from badgering a defendant"). The *Edwards* rule, however, should be counterbalanced against the "unmitigated good" on the part of law enforcement to secure "uncoerced confessions." *McNeil*, 501 U.S. at 181; *see also Oregon v. Elstad*, 470 U.S. 298, 305 (1985)

28

(stating that "admissions of guilt by wrongdoers, if not coerced, are inherently desirable").

If the post-invocation interaction by law enforcement is not interrogative in nature, or indicative of "badgering," then no interest is served in suppressing an otherwise non-coerced statement based on an accused voluntarily changing his mind and agreeing to the "unmitigated good" of accepting responsibility for criminal acts. These types of policy concerns are precisely what we believe the Supreme Court considered as the *Edwards* rule evolved through *Minnick*, *Montejo*, and *Shatzer*. *See Shatzer*, 559 U.S. at 105 (stating that the "*Edwards* presumption of involuntariness ensures that police will not take advantage of the mounting coercive pressures of prolonged police custody . . . by repeatedly attempting to question a suspect who previously requested counsel until the suspect is badgered into submission") (citations and internal quotation marks omitted)).

Assuming *arguendo* that *Hutchins* expands the "protective umbrella" of *Edwards* in the military, notwithstanding the Supreme Court's apparent trend to narrow *Edwards's* prophylactic contours, *Shatzer*, 559 U.S. at 109, the facts in this case dictate a different result. Thus, even if the CAAF intended in *Hutchins* to build a "superstructure of legal refinements around the word 'initiate,'" *Bradshaw*, 462 U.S. at 1045, the circumstances in *Hutchins* are simply not present in this case. The appellee was not "held essentially in solitary confinement" for seven days. *Hutchins*, 72 M.J. at 297. Rather, he was temporarily detained and SA KS explained to the appellee that his release was imminent following SA KS's completion of an affidavit for a search authorization and the appellee's subsequent completion of "booking" procedures. AE CXX at 3-4.

While SA KS may, as a matter of fact, have engaged in communication with the appellee following his invocation of counsel, we conclude that this communication did not constitute reinitiation within the meaning of *Edwards*. First, this was a simple request for consent to search devoid of the interrogative atmosphere that the CAAF implicitly found in *Hutchins*. Nothing about this particular request for consent is suggestive or likely to have led to an interrogation. Second, SA KS's follow-up communication after the appellee refused consent was designed to reduce the appellee's stress by explaining to him why he would be sitting in the room for an extended period. We discern no "compelling influences [or] psychological ploys," *Mauro*, 481 U.S. at 529, associated with this interaction and the military judge found none. Thus, we conclude that this interaction by SA

29

KS was not calculated or likely to "lead to further interrogation."  *Hutchins*, 72 M.J. at 298; *see Shatzer*, 559 U.S. at 106 (holding that a "judicially crafted rule [like *Edwards* or assuming *arguendo Hutchins*] is justified only by reference to its prophylactic purpose") (citation and internal quotation marks omitted)).

Finally, we look to the underlying purpose of *Edwards* as an additional distinguishing factor.  Even if SA KS's communication with the appellee post-invocation triggered *Edwards* protection as interpreted by *Hutchins*, the appellee did not succumb to any law enforcement pressure.  Indeed, by requesting counsel and refusing to give SA KS consent, the appellee achieved his goal "to communicate with police through counsel . . . the essence of *Edwards* and its progeny." *Patterson*, 487 U.S. at 291.  Here, SA KS would not have secured the appellee's statement or his consent for a buccal swab but for the appellee's decision -- after about 15-20 minutes -- to request that SA KS return because the appellee was now "willing to make a statement."  AE CXX at 4.  Accordingly, even assuming *Hutchins* created an expansion of *Edwards* in the military, we distinguish *Hutchins* and hold that under the circumstances of this case, the appellee initiated communication with SA KS for purposes of the *Edwards* rule.

## *Was the Appellee's Subsequent Waiver Voluntary*?

Finding that the military judge erred in his interpretation of the *Hutchins* holding, we move to the next step of determining whether the appellee's subsequent waiver of his rights was knowing and intelligent under all the circumstances.  *See Bradshaw*, 462 U.S. at 1045 (stating that once it has been determined that an accused initiated dialogue with the police, there is a separate inquiry into the voluntariness of the waiver and "clarity of application is not gained by melding them together").

We conclude that the appellee's subsequent waiver of his rights was knowing and intelligent.  Nothing in the military judge's findings of fact indicate any type of coercion.  The appellee was properly advised of his rights and understood them as evidenced by his initial invocation of his right to an attorney, his initial refusal to consent to a search, and his subsequent waiver of those rights by initialing next to each right on the Rights Advisement Form.  AE CXX at 4-5; AE XX at 8-9.  In this regard, we agree with the military's judge's original legal conclusion that the Government met its burden by

a preponderance of the evidence that the appellee freely, knowingly, and intelligently waived his previously asserted right to counsel and also his right to remain silent.  AE IL at 9-10; MIL. R. EVID. 305(g).  Accordingly, the military judge's reconsideration ruling, based on his erroneous interpretation that *Hutchins* compelled suppression of the appellee's oral and written statements, is vacated.

## V. Background: Issue II

With regard to Issue II, we need not extensively recite the findings of fact of the military judge because we hold that the military abused his discretion by conducting the incorrect legal test for evaluating the voluntariness of the seizure of the appellee's DNA from his buccal swab.  To the extent, however, that Issue II includes Fourth Amendment implications, some background is appropriate.

Subsequent to the appellee's waiver of his previously asserted right to counsel and of his right to remain silent, SA KS requested consent from the appellee to seize his buccal cells via a swab.  AE CXX at 5.  The appellee consented, and SA P seized the appellee's buccal cells at approximately 1914 on 22 October 2012.  *Id*.  On 4 January 2013, prior to his buccal cells having been analyzed, the appellee, through counsel, submitted a letter revoking his prior consent.  *Id*. at 6.  On 16 January 2013, SA H, U.S. Army CID, submitted a sworn affidavit to a military magistrate in support of a request for search authorization to analyze, among other things, the appellee's buccal swab.  AE CXIX at 9.  That same day, the military magistrate, Major RA, U.S. Army, issued the search authorization and the appellee's buccal swab was sent to the U.S. Army Criminal Investigation Laboratory for analysis.  AE CXX at 7.  Analysis of the appellee's DNA from his buccal cells, when compared to the evidence seized from KL's body, provided evidence of sexual contact between the two.  *Id*.

## VI. Discussion: Issue II

The military judge's misapplication of *Hutchins* to Issue I drove his analysis as to Issue II.  Based solely on his erroneous assumption that *Hutchins* expanded *Edwards* and created a new *per se* rule, the military judge concluded that the appellee's consent was not valid and was in violation of "the Fourth Amendment and corresponding Military Rules of Evidence." *Id*. at 19.  In essence, the military judge applied a "derivative

31

evidence" rule whereby physical evidence gathered following an *Edwards* violation must be excluded.

In a broad sense, Issue II requires significant analysis under the Fourth Amendment given the appellee's initial consent to seize his buccal cells, his subsequent revocation of consent, an underlying probable cause assessment of the magistrate's search authorization, and application of potential exceptions to the exclusionary rule.[21] *See Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (stating that "[s]uppression of evidence, however, has always been our last resort, not our first impulse"). However, given that our scope of review under Article 62, UCMJ, is limited, we only analyze the threshold question of whether the appellee voluntarily consented to the seizure of his buccal cells. For purposes of this appeal, that is the only theory that the Government seeks to rely upon as a basis for having lawfully acquired the appellee's buccal cells.[22] With regard to

---

[21] The Government argues that even if the appellee's consent was involuntary, his DNA would be admissible under the inevitable discovery exception to the exclusionary rule. Government Brief at 24-25. We note that for purposes of this interlocutory appeal, the Government has recast its argument as to the applicability of the inevitable discovery exception. *Id*. Before the trial court, the Government's inevitable discovery theory was premised on the lawful collection of the appellee's buccal cells pursuant to DoD regulations. AE CXX at 23-24. On appeal, the Government argues that because SA KS was in the process of securing a search authorization for the appellee's DNA, but for the appellee's unilateral change-of-heart, the appellee's DNA would have been inevitably discovered through lawful means by way of a search authorization. Government's Brief at 24-25; *see Wallace*, 66 M.J. at 11-12 (suggesting that had law enforcement "dispatched an agent to obtain a warrant, the subsequent search could arguably have been admissible under the inevitable discovery doctrine") (citing *United States v. Lamas*, 930 F.2d 1099, 1102 (5th Cir. 1991)). We decline to make any judgment on the applicability of the inevitable discovery exception in this case. Because the military judge used the incorrect legal standard in determining whether the appellee's consent was voluntary, it would be premature to consider an exception to the exclusionary rule; an exception would only be ripe in the event of a Fourth Amendment violation. Additionally, and to the extent Article 62, UCMJ, constrains us to consider only the military judge's findings of fact, we believe this same constraint applies to legal theories not considered by the military judge. *See Kosek*, 41 M.J. at 64 (precluding a court of criminal appeals from making rulings of law "not decided by the military judge"). This is particularly true in this case because the Government's recast legal theory on appeal is premised on a significantly different factual predicate.

[22] During oral argument, the Government specifically disclaimed, for purposes of this appeal, a potential alternate theory of admissibility for the seizure: that the Government seized the appellee's DNA sample pursuant to the DoD Instruction 5505.11 requirement that suspects of sexual assault submit a DNA sample as part of standard military booking procedures. The Government relied on this theory at trial and the military judge extensively analyzed

follow-on Fourth Amendment analysis, there are insufficient findings of fact for us to determine whether the military magistrate had sufficient probable cause to issue the search authorization subsequent to the appellee having withdrawn his consent.[23]

The military judge's finding of an *Edwards* violation in light of his misinterpretation of *Hutchins* in turn compelled his conclusion that the appellee's consent to seize his buccal cells was involuntary as a matter of law.  This is incorrect because *Miranda* -- and by extension *Edwards* -- "serves the Fifth Amendment," not the Fourth Amendment.   *Elstad*, 470 U.S. at 306.

Within the context of the Fourth Amendment, the Supreme Court in *United States v. Patane*, 542 U.S. 630, 643-44 (2004), held that the Fourth Amendment does not compel suppression of physical evidence obtained as a result of a statement taken in violation of *Miranda*.  Thus, it inexorably follows that a statement taken in violation of *Edwards*, a "second layer of [judicial] prophylaxis," *McNeil*, 501 U.S. at 176, compels the same result.  *See United States v. Cannon*, 981 F.2d 785, 789 (5th Cir. 1993) (noting that the derivative evidence doctrine is not triggered by an *Edwards* violation) (citations omitted).

Although the plurality in *Patane* specifically held that a *Miranda* violation does not implicate the "fruits doctrine" of *Wong Sun v. United States*, 371 U.S. 471 (1963), and its progeny,

---

it.  Because the Government specifically disclaimed that theory for purposes of this appeal, we express no opinion on the military judge's analysis, his rulings, or whether the seizure of the appellee's buccal cells was reasonable within the meaning of *Maryland v. King*, __ U.S. __, 133 S. Ct. 1958 (2013), as part of established booking procedures within the military.

[23] We note that SA H's affidavit, which accompanied his request to the military magistrate to search the appellee's buccal cells, contained significantly more information than what the military judge adopted in his reconsideration ruling.  *Compare* AE CXIX at 9 *with* AE CXX at 6-7.  Because this is an Article 62, UCMJ, appeal, we may not consider facts from SA H's affidavit as we are bound by the military judge's findings.  *Cossio*, 64 M.J. at 256.  Additionally, we note that the military judge did not sever the information that he believed to be problematic from SA H's affidavit and then examine "the remainder [of the information] to determine if probable cause still exist[ed]" to execute the search of the appellee's buccal cells. *United States v. Gallo*, 55 M.J. 418, 421 (C.A.A.F. 2001); *see United States v. Cowgill*, 68 M.J. 388, 393 (C.A.A.F. 2010) (holding that even if information in an affidavit was provided in reckless disregard of the truth, appropriate course of action is to "sever that information from the affidavit and determine whether sufficient information remained in order for the magistrate to find probable cause").

our superior court has addressed this matter within the context of the *Edwards* rule.  *See Roa*, 24 M.J. at 301 (holding that *Edwards* protection only extends to interrogation and that denial of counsel is only one factor "to be considered in determining whether . . . consent was voluntarily given, but it is not a decisive fact") (Everett, C.J., concurring in the result); *see also Burns*, 33 M.J. at 320 (reaffirming analysis in *Roa* and holding that determination of whether consent is voluntary is based on the totality of the circumstances).  Thus, an *Edwards* violation does not implicate the Fourth Amendment or the corresponding military rules of evidence.  *Burns*, 33 M.J. at 320; *Roa*, 24 M.J. at 300; *see also Patane*, 542 U.S. at 640 (holding that suppression of derivative evidence from a *Miranda* violation cannot "be justified . . . [under the Supreme Court's] close-fit requirement").[24]

This does not, however, end our analysis because the military judge never evaluated the totality of the circumstances on the question of whether the appellee's consent to seize his buccal cells was voluntary, regardless of whether there was an *Edwards* violation.  *Burns*, 33 M.J. at 320; Mɪʟ. R. Evɪᴅ. 314.  Because the military judge adopted the incorrect legal test, he made no findings of fact with regard to whether consent to seize the appellee's buccal cells was voluntary, and we are precluded from finding facts within the context of this Article 62, UCMJ, appeal.  *Cossio*, 64 M.J. at 256.  Applying a totality-of-the-circumstances test for purposes of ascertaining whether consent was free and voluntary, the CAAF has outlined various non-exhaustive factors to be considered.  *See Wallace*, 66 M.J. at 9 (outlining six specific non-exhaustive factors to be considered on the question of whether consent was free and voluntary).

Because the military judge adopted the incorrect legal test and made insufficient findings of fact, we conclude that he erred in suppressing the DNA evidence obtained by CID agents based on the appellee's consent.

### VII. Conclusion

Accordingly, the appeal of the United States is hereby

---

[24] Because *Edwards* is a prophylactic measure to protect only violations of the Fifth Amendment, reliance on the "fruit of the poisonous tree" doctrine articulated in *Wong Sun*, 371 U.S. at 471, and *Brown v. Illinois*, 422 U.S. 590 (1975), fails.  First, *Patane* makes clear that a violation of a judicially-created prophylaxis designed to protect the Fifth Amendment does not apply to the Fourth Amendment.  Second, in both *Wong Sun* and *Brown* there had been underlying violations of the Fourth Amendment in that Mr. Wong Sun and Mr. Brown had both been arrested without probable cause and without a warrant.

granted.  The military judge's rulings as to Issues I and II are vacated.  The record of trial is returned to the Judge Advocate General for remand to the convening authority and delivery to the military judge for reconsideration in light of this opinion. The military judge may, *sua sponte*, or upon request of either party, permit additional evidence and argument on the question of the voluntariness of the appellee's consent to seize his buccal cells, or any other legal or evidentiary issues, and shall make essential findings of fact and conclusions of law thereon.  The trial may then proceed, or the United States may again pursue appeal under Article 62, UCMJ, if appropriate. *Kosek*, 41 M.J. at 65.

Senior Judge MITCHELL and Judge FISCHER concur.

For the Court

R.H. TROIDL
Clerk of Court