# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

### v.

### Airman First Class WILLIAM T. STEVENSON
### United States Air Force

### ACM S32244

### 30 September 2015

Sentence adjudged 29 March 2014 by SPCM convened at Kadena Air Base, Okinawa, Japan. Military Judge: Gregory O. Friedland.

Approved Sentence: Bad-conduct discharge, confinement for 4 months, reduction to E-1, and a reprimand.

Appellate Counsel for the Appellant: Major Thomas A. Smith.

Appellate Counsel for the United States: Major Mary Ellen Payne; Captain Richard J. Schrider; and Gerald R. Bruce, Esquire.

Before

MITCHELL, TELLER, and DUBRISKE
Appellate Military Judges

OPINION OF THE COURT

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.

DUBRISKE, J, delivered the opinion of the court, in which TELLER, S.J., joined. MITCHELL, S.J., filed a separate concurring opinion.

A panel of officer members convicted Appellant, contrary to his pleas, of one specification of failing to obey a lawful order and seven specifications alleging wrongful possession, use, introduction, and distribution of controlled substances in violation of Articles 92 and 112a, UCMJ, 10 U.S.C. §§ 892, 912a. The panel sentenced Appellant to a bad-conduct discharge, 4 months confinement, reduction to E-1, and a reprimand. The convening authority approved the sentence as adjudged.

On appeal, Appellant argues the military judge erred in failing to suppress statements he made to criminal investigators after invoking his right to counsel. Additionally, pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), Appellant asserts the military judge committed error by allowing the Government's expert witness to repeat testimonial hearsay in violation of the Confrontation Clause.[1] Although we identified errors in the post-trial processing of this case, we conclude Appellant is not entitled to relief and affirm.

*Suppression of Appellant's Statement*

Appellant was suspected by the Air Force Office of Special Investigations (AFOSI) at Kadena Air Base of improperly purchasing and using Bron, a Japanese cough medicine containing dihydrocodeine, a Schedule III controlled substance. To facilitate the investigation, AFOSI agents conducted an off-base surveillance operation of Appellant's movements on the evening of 13 June 2013.

After observing Appellant entering several Japanese drug stores, the agents requested Security Forces personnel stop and detain Appellant as he drove onto Kadena Air Base. Appellant was removed from his vehicle and transported to a Security Forces building around 1800 hours. A subsequent search of the vehicle revealed multiple boxes of Bron, as well as receipts documenting the purchase of Bron.

Shortly after AFOSI agents completed the search of Appellant's vehicle, Appellant was moved to an AFOSI interview room around 2032 hours.[2] The room was normally used for child interviews and contained multiple couches, one of which Appellant used to rest while waiting. Appellant was provided opportunities to smoke and use the restroom. He was also provided with water and a blanket due to the temperature in the interview room.

Special Agent RM and Special Agent AS started their interview of Appellant at 2324 hours. After engaging in small talk with Appellant about his family, military duties, and future plans, Special Agent RM read Appellant his rights under Article 31, UCMJ, 10 U.S.C. § 831, for failing to obey a general order in violation of Article 92, UCMJ, 10 U.S.C. § 892.[3] Appellant paused after being advised of his right to counsel, informing Special Agent RM that he understood his rights, but was "debating" whether to talk to a lawyer. Special Agent RM re-read Appellant his rights regarding counsel and attempted

---

[1] U.S. CONST. amend. VI.

[2] The prosecution conceded at trial that Appellant had been apprehended and was not free to leave the Air Force Office of Special Investigations (AFOSI) offices.

[3] This was based on Appellant's suspected use of over-the-counter cough medicine as an intoxicating substance. *See generally* Air Force Instruction (AFI) 44-120, *Military Drug Demand Reduction Program*, ¶ 1.1.6 (3 January 2011) (superseded by AFI 90-507 (22 September 2014)).

to clarify whether Appellant was requesting an attorney. Appellant advised he did not want counsel and was willing to continue with the interview.

Approximately seven minutes later, prior to making any incriminating statements, Appellant and Special Agent RM engaged in the following dialogue:

> Appellant: Like, I really appreciate you guys like hooking me up and everything like this. I really do understand where you guys are coming from. But, at the same time, before I start answering questions, I would like to get a second opinion from a legal source. I mean, I understand where you're coming from sir. The whole, you know, you want me to be out there completely. . . . I do appreciate everything you guys are doing, but the same time, it's just, I would like to get, talk to a lawyer, if that would be okay I mean.

> RM: It's your choice man. We're not going to say no, and lock you in and turn the light off. That's your legal right; that's why I read it from the card. We're not going to stop you from doing that, that's your right. If that's what you think and you feel is going to be beneficial, than that's great; that's fine man. Uh, so, I'm just, for the sake of administrative stuff. You said that you wanted to consult with a lawyer.

> Appellant: Yes sir.

> RM: Okay. So, for instance, do you want a lawyer?

> Appellant: Yes, sir.

> RM: And you are no longer willing to answer questions, correct.

> Appellant: Uh, not until I consult with a lawyer.

> RM: That's cool man.

> Appellant: All right.

> RM: Well, um, sadly, you still have to hang out here a little bit longer. We have some other stuff that we want to do, want to finish. Um, so there's that. Yea, I mean that's your

right.  Just think about it . . . think as hard and as long as you need to.  Okay.  Now I am going to ask you to, if you say you are going to get a lawyer, go get a lawyer.  If you need help, talk to the first sergeant if you don't know how to go about doing that, but don't jerk my leg. . . .  You know what I mean.

Appellant:  I am not planning on it sir.  You guys have been awesome to me, and I am trying to help you guys out too.

RM:  No problem man.  Just hang out here for a little bit longer. . . .

After Special Agent RM and Special Agent AS left the interview room, Appellant remained seated on a couch.  Three minutes later, Appellant got up, put his shoes on and knocked on the interview room door.  When Special Agent RM answered the door, Appellant made the following statement:

Hey sir, you know, I was thinking about it.  I don't really know . . . I'd be down to talk to you guys some more tonight.  Like, I'd be willing to answer more questions.  I know I may invoke.  I don't know if I already administratively hit the stop, hit the brakes on this.

Special Agent RM informed Appellant there was a way they could continue to talk, but he would have to provide Appellant a cleansing statement and re-read his Article 31, UCMJ, rights.  Special Agent RM also reminded Appellant he could stop questioning or ask for a lawyer at any time.  After being read his Article 31, UCMJ, rights again, Appellant made both oral and written statements regarding his involvement with Bron and lysergic acid diethylamide (LSD).[4]

At trial, Appellant moved to suppress both his oral and written statements on the theory they were taken in violation of his right to counsel.  After hearing testimony from Special Agent AS[5] and reviewing the videotape of Appellant's interview with AFOSI, the military judge denied Appellant's motion; finding by a preponderance of evidence that Appellant initiated further communication with AFOSI.  Additionally, although he found Special Agent RM's comments to Appellant were not the "most prudent advice" given the circumstances, the military judge determined the comments were not further interrogation in violation of *Edwards v. Arizona*, 451 U.S. 477 (1981).  On appeal,

---

[4] The agents did not learn about Appellant's involvement with lysergic acid diethylamide (LSD) until after the initial interview in which Appellant invoked his rights.  The information was provided by one of Appellant's friends who was being interviewed by another AFOSI agent at the same time.  Based on this information, Appellant's second rights advisement included a violation of Article 112a, UCMJ, 10 U.S.C. § 912a.

[5] There is no discussion in the record as to why Special Agent RM did not testify during the motion hearing.

Appellant maintains the military judge erred in determining Special Agent RM's comments did not amount to further interrogation.

"A military judge's denial of a motion to suppress a confession is reviewed for an abuse of discretion." *United States v. Chatfield*, 67 M.J. 432, 437 (C.A.A.F. 2009). Under this standard, the military judge's findings of fact are upheld unless they are clearly erroneous or unsupported by the record; however, we review de novo any conclusions of law supporting the denial of a motion to suppress a confession. *Id*.; *United States v. Swift*, 53 M.J. 439, 446 (C.A.A.F. 2000). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie,* 66 M.J. 198, 199 (C.A.A.F. 2008)). This standard of review recognizes a judge has a range of choices and will not be reversed so long as the decision remains within that range. *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004).

In *Edwards*, the Supreme Court developed a bright-line rule prohibiting law enforcement from further interrogating a suspect in custody once the suspect asserts his right to counsel until either counsel has been made available to him, or the suspect initiates further communication, exchanges, or conversations with law enforcement. *Edwards*, 451 U.S. at 484–85; *see* Mil. R. Evid. 305(g)(2)(B). The judicially-created rule, based on a Fifth Amendment[6] right as construed in *Miranda v. Arizona*, 384 U.S. 436 (1966), was designed to protect a suspect in custody from being badgered by law enforcement through further interrogation. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983).

In the case sub judice, given Appellant was not provided an attorney, the primary question is whether Appellant was interrogated by Special Agent RM prior to him reinitiating communications with AFOSI. For reasons discussed in more detail below, we do not believe the military judge abused his discretion in determining the special agent's statements to Appellant were not further interrogation in violation of *Edwards*.

In addressing what constitutes interrogation, the *Edwards* court applied the standard previously set out in *Rhode Island v. Innis*, 446 U.S. 291 (1980). *See Edwards*, 451 U.S. at 487. In *Innis*, the Supreme Court held interrogation includes not only express questioning, but also words and actions that police should know are reasonably likely to elicit an incriminating response. *Innis*, 446 U.S. at 301; *see also United States v. Young*, 49 M.J. 265, 267 (C.A.A.F. 1998). Interrogation can also include "psychological ploys" such as questioning the guilt of the subject or minimizing the serious nature of the offense under investigation. *Innis*, 466 U.S. at 299. Determining whether words or

---

[6] U.S. CONST. amend. V.

actions are reasonably likely to elicit an incriminating response turns on "the perceptions of the suspect, rather than the intent of the police." *Id*. at 301. However, "interrogation involves more than merely putting questions to an individual." *United States v. Ruiz*, 54 M.J. 138, 141 (C.A.A.F. 2000). It must "reflect a measure of compulsion above and beyond that inherent in custody itself." *Innis*, 446 U.S. at 300.

As previously recognized by our superior court, "There is no blanket prohibition against a comment or a statement by a police officer after invocation of rights." *Young*, 49 M.J. at 267. Justice Powell also noted this fact in his concurring opinion in *Edwards* when he stated:

> Communications between police and a suspect in custody are commonplace. It is useful to contrast the circumstances of this case with typical, and permissible, custodial communications between police and a suspect who has asked for counsel. For example, police do not impermissibly "initiate" renewed interrogation by engaging in routine conversations with suspects about unrelated matters. And police legitimately may inquire whether a suspect has changed his mind about speaking to them without an attorney. It is not unusual for a person in custody who previously has expressed an unwillingness to talk or a desire to have a lawyer, to change his mind and even welcome an opportunity to talk. Nothing in the Constitution erects obstacles that preclude police from ascertaining whether a suspect has reconsidered his original decision.

*Edwards*, 451 U.S. at 490 (Powell, J., concurring) (citations omitted).

Examining the entire conversation between Appellant and Special Agent RM, we do not believe Appellant was subjected to more than the "subtle compulsion" allowed by *Innis*. *See Innis*, 446 U.S at 303. We note the alleged improper conversation was very brief. *See id.* (noting favorably that police did not engage in a "lengthy harangue" in the suspect's presence). Special Agent RM was also not seeking a response from Appellant but instead was very directive in nature with his language. *See Pennsylvania v. Muniz*, 496 U.S. 582, 605 (1990) (holding police conduct was not the functional equivalent of interrogation when it was not likely to be perceived as calling for an incriminating response). His comment for Appellant to "think about it" was made in a non-confrontational tone and was not reasonably likely to elicit an incriminating response. *See United States v. Comosona*, 848 F.2d 1110, 1113 (10th Cir. 1988) (handing a suspect a business card and telling him to call the agent collect if he wanted to talk about an incident was not an interrogation).

Likewise, Special Agent RM's comment about Appellant obtaining legal counsel does not equate to interrogation. The statement cannot be reasonably assessed as attempting to dissuade Appellant from seeking counsel. *Cf. United States v. McLaren*, 38 M.J. 112, 116 (C.M.A. 1993) (holding that an agent's statement to a suspect that he needed to make a decision about seeking legal counsel was not further interrogation). In fact, Special Agent RM instructed Appellant on how he could go about securing counsel if he was unsure how to exercise this constitutional right. While Special Agent RM warned Appellant not to "jerk him around," this statement, when viewed in context of the entire conversation, was not reasonably likely to elicit an incriminating response.

While Special Agent RM's comments may have possibly caused Appellant to change his mind about speaking with AFOSI, this fact is not sufficient in and of itself to show interrogation. *See Arizona v. Mauro*, 481 U.S. 520, 528–29 (1987) ("Officers do not interrogate a suspect simply by hoping he will incriminate himself."). The comments, as noted above, were not evocative or otherwise coercive. *See Montejo v. Louisiana*, 556 U.S. 778, 805 (2009) (Stevens, J., dissenting) (noting that *Edwards* was designed to prevent police from coercing suspects into revoking the request for counsel). No threats were made, and there was no attempt by Special Agent RM to remind Appellant of any inculpatory evidence AFOSI had against him. *See Nelson v. Fulcomer,* 911 F.2d. 928, 935 (3d Cir. 1990) (confronting a suspect with his alleged partner in crime and claiming that the partner confessed is interrogation). We are also persuaded by the fact Special Agent RM left the room after making the alleged improper statement to Appellant. *Cf. United States v. Brabant*, 29 M.J. 259, 263 (C.M.A. 1989) (concluding that ordering an accused to attend a meeting with his commander was a reinitiation of an interrogation since this confrontation had the natural tendency to induce the making of a statement by the accused).

After finding no violation of the *Edwards* rule in Appellant's case, we must next look at whether Appellant's waiver was knowing and intelligent. *See Bradshaw*, 462 U.S. at 1046. This determination is viewed under the totality of the circumstances, including the background, experience, and conduct of Appellant. *Id.*; *see also Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."). These circumstances include Special Agent RM's statements to Appellant after he invoked his rights.

The military judge found Appellant's waiver was voluntary after examining all of the circumstances surrounding the interview. We adopt the military judge's findings of fact on the issue of waiver as they are fully supported by the record of trial. In determining Appellant's waiver was knowing and intelligent, we note Appellant was 21 years old at the time of the interview and scored above the 90th percentile on all portions

of his military vocational aptitude test. We are confident Appellant understood his rights as repeatedly explained in detail by Special Agent RM.

We are also confident Appellant's waiver was of his own accord. While Appellant was in custody for a significant period of time, he was not deprived of basic necessities and was allowed to rest on a couch while waiting in the interview room. Appellant was not threatened during the interview, nor was he subjected to deception in an attempt to get him to talk about the allegations against him. Appellant did break down at the end of the interview, which resulted in his transfer to a local emergency room. However, the video of Appellant's second rights advisement conclusively rebuts any claim he was under significant mental or emotional stress at the time he waived his rights and engaged in additional discussion with AFOSI.

In holding the military judge did not abuse his discretion, we are mindful of our superior court's opinion in *United States v. Hutchins*, 72 M.J. 294 (C.A.A.F. 2013), which found an *Edwards* violation based on the government's reinitiation of communication with a suspect. The appellant in *Hutchins* had initially invoked his right while being investigated for, among other things, the murder of an Iraqi civilian. After invoking his rights, the appellant was confined to a trailer under armed guard where he was not allowed to use the telephone or otherwise contact an attorney. A week later, the same Naval Criminal Investigative Service (NCIS) agent who initially interviewed the appellant entered the trailer and asked if the appellant would consent to a search of his personal belongings. While the NCIS agent was reading the consent form, the appellant asked if the door was still open to tell his side of the story. He was later readvised of his Article 31 rights and provided a detailed confession.

In suppressing the appellant's confession, the Court of Appeals for the Armed Forces (CAAF) held the request for consent to search posed by the NCIS agent opened up a generalized discussion related to an ongoing investigation that, under the factual circumstances of the case, violated the appellant's Constitutional rights.[7] *Id*. at 299.

Like our sister court in *United States v. Maza*, 73 M.J. 507, 525 (N.M. Ct. Crim. App. 2014), we do not believe our superior court's opinion in *Hutchins* necessarily expands the *Edwards* rule as it applies to military practice. As the *Hutchins* majority stated:

> To be clear, our decision in this case does not affect this basic proposition [regarding the definition of interrogation]. However, the issue we address today is not whether the request for consent to search was an "interrogation," but

---

[7] The majority in *Hutchins* appears to question whether the agent's communication was entirely non-interrogative when it noted "the communication was more than a simple request for consent to search, but instead included an implicit accusatory statement." *United States v. Hutchins*, 72 M.J. 294, 299 n.10 (C.A.A.F. 2013).

> rather was it a reinitiation of "further communication" prohibited by *Edwards* and *Bradshaw*.

*Hutchins*, 72 M.J. at 299 n.9. Likewise, the CAAF specifically noted that "[n]ot all communications initiated by law enforcement will trigger the protections under *Edwards*." *Id*. at 298. Given this language, we believe, like our sister court in *Maza*, that the *Hutchins* holding is not a per se bar to all police initiated communication after invocation of rights, but instead should be read in conjunction with the facts and circumstances of each case. *See id*. at 299 n.10 (noting the legal question is whether, under all of the surrounding circumstances, the Government reinitiated communication).

Irrespective of the holding in *Hutchins*, we believe the facts and circumstances of the case now before us are easily distinguishable and establish Appellant's voluntary statement was not the product of any communication initiated by AFOSI. The obvious and primary distinction, we believe, is who reinitiated communication. In *Hutchins*, it was the NCIS agent who approached the suspect and initiated a conversation after invocation of rights. In the case before us, however, it was Appellant who made contact with Special Agent RM and advised he was willing to continue the previously terminated interview. *See generally Maza*, 73 M.J. at 524 n.20 (citing several federal opinions finding no *Edwards* violation when there is a temporal break between invocation and reinitiation of communication by a suspect).

Additionally, Appellant, unlike the appellant in *Hutchins*, was not subjected to long-term, oppressive custodial conditions when the alleged non-interrogative communication took place. Appellant was not deprived of basic necessities and was allowed to rest on a couch while waiting in the interview room. In *Hutchins*, on the other hand, the appellant had been in conditions similar to solitary confinement at a deployed location in Iraq for seven days prior to the NCIS agent reestablishing contact.

Finally, Appellant's case is distinguishable as he was provided access to the legal counsel he requested. Special Agent RM instructed Appellant on how to secure legal counsel and informed Appellant he would soon be released from AFOSI custody after additional administrative requirements were completed. Conversely, the appellant in *Hutchins* had not been provided access to counsel in the seven days since his invocation of rights, nor was he provided with an opportunity to make contact with a defense attorney.

Although we believe the last two distinguishing facts are more relevant in determining whether Appellant's subsequent waiver of his rights was voluntary, it is clear from the CAAF's discussion in *Hutchins* that the facts underlying the law enforcement interaction matter in determining who initiated post-invocation communication. Given the very different factual circumstances in Appellant's case as compared to *Hutchins*, we

find no *Edwards* violation as Appellant reinitiated communication, and his subsequent statement was not the direct result of any interaction with AFOSI.

*Confrontation Clause Violation*

Appellant next argues the military judge erred when he allowed the Government's expert witness to testify about the results of his urinalysis. We find no error in the handling of this evidence.

Prior to the entry of pleas, Appellant's trial defense counsel moved in limine to limit the testimony of the Government's expert witness in forensic toxicology. Citing the Confrontation Clause and Mil. R. Evid. 403, trial defense counsel specifically requested the Government's expert be prohibited from testifying Appellant's urine sample, which was reported as negative by the Armed Forces Medical Examiner System (AFMES) laboratory, did appear to contain some minimal level of LSD metabolite. Trial defense counsel called the Government's expert on the motion, eliciting testimony that the sample provided by Appellant was suggestive of LSD use based on the scientific data contained in the drug testing report.

In denying the defense motion, the military judge found the Government's expert could rely on the drug testing report in forming his own opinion about the testing results. However, the military judge informed the parties he planned to give a limiting instruction to the court members that any reference to the results of Appellant's drug test was not substantive evidence and could only be used for the limited purpose of corroborating Appellant's confession.

During the cross-examination of the Government's first witness, an AFOSI special agent, trial defense counsel successfully admitted the negative AFMES testing report.[8] Trial defense counsel also asked the agent to confirm the negative results were based on "a scientific determination by a federal agency."

The Government later called its expert witness to discuss the negative test results. Relying primarily on the machine generated data from the drug testing report, the expert opined Appellant's urine sample was suggestive for the presence of LSD. Trial defense counsel elicited from the expert on cross-examination that he could not definitively state LSD was in Appellant's urine sample. The expert also acknowledged various drugs, including one previously taken by Appellant, could produce a false positive for LSD.

Even though a military judge's decision to admit evidence is reviewed under an abuse of discretion standard, *United States v. Clayton*, 67 M.J. 283, 286 (C.A.A.F. 2009),

---

[8] Trial counsel had previously made motion in limine to prevent the admission of this report through the case agent. The military judge denied this motion.

the question of whether the admitted evidence violates the Confrontation Clause of the Sixth Amendment is reviewed de novo. *United States v. Blazier*, 68 M.J. 439, 442 (C.A.A.F. 2010). If we find a violation of the Confrontation Clause, we cannot affirm the conviction unless this court is convinced beyond a reasonable doubt that the error was harmless. *United States v. Rankin*, 64 M.J. 348, 353 (C.A.A.F. 2007).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. Therefore, "no testimonial hearsay may be admitted against a criminal defendant unless (1) the witness is unavailable, and (2) the witness was subject to prior cross-examination." *United States v. Blazier*, 69 M.J. 218, 222 (C.A.A.F. 2010) [hereinafter *Blazier II*] (citing *Crawford v. Washington*, 541 U.S. 36, 53–54). The Sixth Amendment bars only testimonial statements because "[o]nly statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821 (2006).

The testimony of the Government's expert witness in this case did not violate Appellant's right to confrontation.[9] As recently confirmed by our superior court in *United States v. Katso*, 74 M.J. 273, 283–84 (C.A.A.F. 2015), an expert who did not perform forensic testing may still provide an opinion regarding the testing results at trial, provided the opinion is based on the expert's independent review of the case. This same analysis has been previously applied to an expert's reliance on a drug testing report like that at issue in Appellant's case. *See Blazier II*, 69 M.J. at 224–225.

Here, as in *Katso*, the Government's expert conducted a thorough review of the entire case against Appellant, including the AFMES drug testing report. His opinion regarding the possible presence of LSD in Appellant's urine sample was based on his own independent review of the machine generated data. This determination is clearer here than in most cases before us given the "testimonial" portions of the AFMES lab report did not address the possible presence of LSD, instead reporting the sample as negative.

In examining the record of trial under Article 66(c), UCMJ, 10 U.S.C. § 866(c), we do find that the Government's expert witness improperly discussed the results of forensic testing performed by the United States Army Criminal Investigation Laboratory (USACIL) in this case. USACIL tested the over-the-counter medication seized from Appellant and found it to contain dihydrocodeine. It appears from the record the Government's expert did not perform any independent analysis of this forensic testing,

---

[9] Although not raised as a specific assignment of error, we also believe the military judge did not abuse his discretion in allowing the Government to provide additional information about Appellant's negative urinalysis. *See United States v. Johnson*, 41 M.J. 13, 16 (C.M.A. 1994). This is especially true once the defense admitted the results of Appellant's drug test. *See United States v. Johnson*, 20 M.J. 610, 612 (A.F.C.M.R. 1985) (stating that the prosecution would be entitled to rebut any false impression created by the evidence of a negative urinalysis).

and instead only repeated what was provided by USACIL personnel in their report. As these testing results, by themselves, are clearly testimonial, the admission of the information through a surrogate expert is improper. *See Blazier II*, 69 M.J. at 226. However, given the overwhelming evidence supporting Appellant's convictions for possession and use of dihydrocodeine, we find this error to be harmless beyond a reasonable doubt. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

*Post-Trial Processing Errors*

Although not raised by the parties, we note the report of result of trial memorandum attached to the Staff Judge's Advocate's Recommendation (SJAR) is erroneous in that it fails to address Charge IV and its specification alleging a violation of Article 134, UCMJ, 10 U.S.C. § 934. This offense, which was dismissed by the military judge after arraignment pursuant to defense motion, should have been addressed by the report of result of trial memorandum and captured on the initial promulgating order. *See* Rules for Courts-Martial 1106(d)(3) and 1114(c)(1); Air Force Instruction 51-201, *Administration of Military Justice*, ¶¶ 9.2.1 and 10.8.2.2 (6 June 2013). Although we find Appellant is not entitled to additional post-trial processing given he suffered no material prejudice from this error, we direct completion of a corrected court-martial order to reflect the dismissed charge and specification.

We also note the SJAR contained additional errors. The document was signed by the Deputy Staff Judge Advocate (DSJA) instead of the Staff Judge Advocate (SJA). However, as there was no evidence in the record of trial the DSJA was not the Acting SJA for post-trial matters, no corrective action is necessary. *See United States v. Wilson*, 54 M.J. 57, 59 (C.A.A.F. 2000). Finally, the SJAR misstated the maximum punishment for a special court-martial. While this error is plain and obvious, we find Appellant suffered no material prejudice. *See United States v. Flores*, 69 M.J. 651, 657 (A.F. Ct. Crim. App. 2010), *aff'd*, 69 M.J. 366 (C.A.A.F. 2011).

*Conclusion*

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and the sentence are **AFFIRMED**.

MITCHELL, Senior Judge, concurring

I concur with the majority opinion. I write separately to further address the errors in the SJAR. Congress required the SJA to sign the SJAR. Article 60(d), UCMJ, 10 U.S.C. § 860(d); *Wilson*, 54 M.J. at 59. It is error for the DSJA to sign the SJAR and the addendum, unless the deputy is the acting SJA. Our superior court has determined that

error in the signature block is usually a minor clerical error when the person signing the SJAR is not statutorily disqualified and may have been the acting staff judge advocate. The SJAR also contains the error of listing a maximum punishment which exceeded the statutory cap of a special court-martial. *See Flores*, 69 M.J. at 657. When error exists in post-trial processing, we will grant relief when the appellant presents "some colorable showing of possible prejudice." *United States v. Wheelus*, 49 M.J. 283, 289 (C.A.A.F. 1998). Here both errors were present in the SJAR and Appellant did not raise any complaint in his clemency. The signature block error was repeated in the addendum and the maximum sentence error was not corrected. Appellant's assignments of error with this court did not raise these issues for our consideration. Given that Appellant did not object and has not articulated any prejudice, I agree with the majority that relief is not warranted as there is no colorable showing of possible prejudice. We again exhort staff judge advocates (and acting staff judge advocates) to pay careful attention to the post-trial paperwork by following the statutory and regulatory requirements set forth in the Manual for Courts-Martial and Air Force Instruction 51-201, *Administration of Military Justice*. *See United States v. Parker,* 73 M.J. 914, 921 (A.F. Ct. Crim. App. 2014) ("The Government's neglectful post-trial processing . . . created an issue where none should have existed.").



FOR THE COURT

STEVEN LUCAS
Clerk of the Court