*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
KISOR, DALY, and MIZER
Appellate Military Judges

———————————————

**UNITED STATES**
*Appellant*

**v.**

**Benjamin L. PENNISSON**
Lance Corporal (E-3), U.S. Marine Corps
*Appellee*

**No. 202300328**

———————————————

Decided: 26 August 2024

Appeal by the United States Pursuant to Article 62, UCMJ
*upon reconsideration*

Military Judge:
Eric A. Catto

Arraignment 8 November 2023 before a general court-martial convened at Marine Corps Base Hawaii.

For Appellant:
*Lieutenant Lan T. Nguyen, JAGC, USN* (argued)
*Lieutenant Michael A. Tuosto, JAGC, USN* (on brief)

For Appellee:
*Major Joshua P. Keefe, USMC* (argued and on brief)

Senior Judge KISOR delivered the opinion of the Court, in which Senior Judge DALY and Judge MIZER joined. Judge MIZER filed a separate concurring opinion.

———————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

———————————————

KISOR, Senior Judge:

This case is before us on an interlocutory appeal pursuant to Article 62(a)(1)(B), Uniform Code of Military Justice (UCMJ).[1] We issued an unpublished opinion on 24 June 2024, and the Government moved for en banc and panel reconsideration. This Court denied en banc reconsideration but granted panel reconsideration. Consequently, on 26 August 2024, our prior unpublished opinion was withdrawn by separate Order. This Opinion replaces it.

Appellee is charged with one specification of child endangerment and two specifications of domestic violence, in violation of Articles 119b and 128b, UCMJ.[2]

On 27 October 2023, trial defense counsel moved to suppress five of Appellee's statements: two to officers with the Honolulu Police Department (HPD), one to his battalion commander, one to his sergeant major, and one to Marine Corps Criminal Investigation Division (CID) investigators.[3] In his ruling, the military judge granted the motion to suppress in part, holding that the statements Appellee made to CID were involuntary for two reasons: (1) because CID continued questioning Appellee after he unambiguously invoked his right to counsel, and (2) because the CID Agent failed to give a cleansing warning following Appellee's prior statement to the sergeant major.[4] The military judge also suppressed Appellee's statements to his sergeant major.

---

[1] 10 U.S.C. § 862(a)(1)(B).

[2] 10 U.S.C. §§ 919b, 928b.

[3] App. Ex. VI.

[4] App. Ex. XI at 17.

On interlocutory appeal, the Government asserts that the military judge abused his discretion when he suppressed Appellee's 23 March 2023 statements to CID. The Government does not appeal any other part of the military judge's ruling suppressing statements to Appellee's sergeant major. The military judge did not suppress Appellee's statements made to the HPD and that portion of the military judge's ruling is not currently before this Court as part of the Government's interlocutory appeal.[5] We again hold that the military judge did not abuse his discretion in suppressing Appellee's statements to CID.

## I. BACKGROUND

Appellee is charged with crimes related to injuries sustained to his child on 2 February 2023 and 18 March 2023. The military judge's detailed findings of fact span seven single-spaced pages of his eighteen-page ruling and are summarized in relevant part below.[6] This Court is bound by the facts found by the military judge unless they are clearly erroneous. As it relates to the specific issue the Government appealed, we conclude that the military judge's findings of fact are supported by the record and are not clearly erroneous. Importantly, in cases appealed to this Court under Article 62, UCMJ, this Court does not have authority to find facts in addition to those found by the military judge.[7]

### A. The injuries to the child

On 2 February 2023, Appellee and his wife, A.P., brought their seven-week-old child to Tripler Army Medical Center, and then to Queen's Medical Center, due to an oval shaped purple bruise on her left cheek, a laceration near her lip and pooling of blood under her left eye. A few days later Marine Corps Base Hawaii (MCBH) Criminal Investigation Division (CID) initiated an investigation into Appellee after Child Protective Services (CPS) alerted CID that the injuries to the child were possibly the result of abuse. The HPD and CID separately began conducting investigations into the incident.

---

[5] The military judge also found that there is no evidence that LtCol. G. (the battalion commander) ever spoke directly to Appellee about the 18 March 2023 incident and, accordingly, there was no statement to her to suppress. App. Ex. XI at 4.

[6] AE XI at 2-8.

[7] *See United States v. Gore*, 60 M.J. 178, 185 (C.A.A.F. 2004); *United States v. Maza*, 73 M.J. 507, 513 (N-M. Ct. Crim. App. 2014); *see generally United States v. Flanner*, No. 202300134, 2023 CCA LEXIS 428 (N-M. Ct. Crim. App. Oct 10, 2023) *rev. granted* 84 M.J. 303 (C.A.A.F. 2024) (resolving a Government Appeal under Article 62, UCMJ without finding additional facts.).

Six weeks later, on 18 March 2023, Appellee and his wife brought the now three-month-old child to Castle Emergency Room for new injuries to her head. The ER diagnosed her with a subdural hematoma, skull fractures, and a brain bleed.

At Castle ER, the attending physician on duty had one of his nurses contact HPD because the child's injuries were suspicious and did not match up with the mother's explanation of what caused those injuries. HPD officers responded to the hospital. An HPD officer overheard Appellee tell his wife that he was going to tell them what happened. Appellee explained to his wife that while holding the child, he accidently walked her into the wall, injuring her head. CPS personnel responded and took the child into protective custody at the ER, and the child was transported to Kapiolani Hospital for further medical care. That evening, Sergeant Major (SgtMaj) H. notified Appellee's Commanding Officer, Lieutenant Colonel (LtCol) G., about the second incident. SgtMaj H. and LtCol. G. were also informed the child had been removed from the parents' custody by CPS.

## B. HPD Interviews

On Tuesday, 21 March 2023, officers from the HPD met with Appellee and his wife for three hours at their residence. While his wife was interviewed, Appellee voluntarily performed a "doll reenactment" with an HPD detective to demonstrate his version of the events on 18 March 2023, showing how the child had been injured. During and after that reenactment, Appellee made statements to HPD regarding the 18 March 2023 incident.

## C. Appellee's Statement to SgtMaj H.

On 22 March 2023, the MCBH Incident Determination Committee (IDC) met to discuss the 2 February 2023 incident. At that meeting, LtCol G. informed the IDC members that a second incident occurred on 18 March 2023. The MCBH CID representative attending the IDC meeting, Chief Warrant Officer 2 (CWO2) P., informed LtCol G. that CID had not heard about the second incident, and requested assistance to coordinate an interview between Appellee and CID as soon as possible. The IDC determined the 2 February 2023 incident met criteria for Family Advocacy Program (FAP) involvement. LtCol G. asked SgtMaj H. to meet with Appellee to brief him on the IDC determination from the 2 February 2023 incident. He was also asked to collect more information about where Appellee's child was currently located and whose custody she was in. LtCol. G. also informed SgtMaj H. that CID wanted to interview Appellee and instructed SgtMaj H. to coordinate with CID to arrange that interview.

Prior to meeting with Appellee, SgtMaj H. knew CPS suspected Appellee of injuring his child on 2 February 2023, and that the IDC had determined that the February incident met criteria to warrant FAP services. SgtMaj H. had also been informed: (1) that Appellee had dropped his baby on 18 March 2023, possibly causing a skull fracture, requiring the baby to be taken to the hospital, possibly causing a skull fracture; (2) that CPS had taken custody of the baby away from Appellee and his wife; (3) that CPS had deemed the case non-accidental; and (4) that HPD had interviewed Appellee about the incident on 21 March 2023. Importantly, LtCol G. had directed SgtMaj H. to coordinate with CID for Appellee to be interviewed on 23 March 2022.

SgtMaj H. summoned Appellee to his office the morning of 23 March 2023. During the meeting with Appellee, SgtMaj H. explained the IDC's determination regarding the 2 February 2023 incident and had Appellee sign some paperwork. SgtMaj H. also inquired into the welfare of the baby and asked Appellee, "What happened?" referring to the events of 18 March 2023.

At no point did SgtMaj H. read Appellee his Article 31(b) rights. SgtMaj H. testified at the motions hearing and claimed he did not read Appellee his rights because he had no reason to doubt Appellee's version of the events and he did not suspect Appellee of a violation of the UCMJ.

Appellee also testified at the Article 39(a) hearing and claimed that prior to SgtMaj H. asking him, "What happened?" Appellee had informed SgtMaj H. that he wanted to speak to an attorney and had an appointment to do so later that afternoon. However, SgtMaj H. testified at the Article 39(a) hearing that he did not remember whether Appellee ever discussed a desire to speak with an attorney during that meeting. SgtMaj H. acknowledged that he knew that child endangerment and child abuse are violations of the UCMJ, and he was aware that abuse could be intentionally committed or committed through negligence.

The military judge found that SgtMaj H. called CID immediately after his meeting with Appellee and discussed the contents of the meeting, including Appellee's answer to his question, "What happened?" referring to the 18 March 2023 incident. The CID investigation log reflects that CID spoke to SgtMaj H. on the phone about Appellee at approximately 0906 on 23 March 2023.

SgtMaj H. sent a text message to LtCol G. on 23 March 2023 in which he briefed her about his meeting with Appellee. The text message from LtCol G.'s phone shows the message was received at 1527, but that screenshot was taken from LtCol G.'s cell phone in the summer/fall of 2023 while LtCol G. was physically located on the East Coast of United States. The military judge found this 1527 text message was received by LtCol G. at 1527 Eastern Standard Time,

which was 0927 Hawaii Standard Time. That text informs LtCol G. that Appellee:

> . . .walked [SgtMaj H.] through what happened with the latest incident. Step by Step. He has court tomorrow morning. I called Agent G. and brought him up to speed with the latest incident. Pennison [sic] is currently being escorted to CID to speak with Agent G.. CPS has deemed the case not accidental. The baby is with aunt and uncle until spouses [sic] mother gets a valid ID. Which supposedly happened yesterday. He has an appointment with CPS and attorney this afternoon.[8]

The military judge found, as fact, that this message indicated that SgtMaj H. knew Appellee desired to speak with an attorney on 23 March 2023, and that CPS had deemed the case not accidental.

### D. Appellee's subsequent statement to CID

After the meeting at SgtMaj H.'s office, Appellee drove himself back to his workspace, and he was immediately escorted by his staff noncommissioned officer (SNCO) to CID to be interviewed. Appellee was neither able to meet with an attorney prior to being escorted, nor to refuse going to the CID office. When Appellee arrived at the CID building, Agent G. had him empty his pockets and escorted him into one of the interrogation rooms. The Agent patted down Appellee prior to speaking with him. The CID agents interrogated Appellee while he was in the custody of law enforcement. The interview was video recorded.

At 02:45 of the interview video, Agent G. informed Appellee that "before I ask you any of the questions I need to ask you today, I do have to go over the rights advisement with you one more time, ok?"[9] At 03:36 of the video, Agent G. stated to Appellee, "Same form as before. I am going to go through this with you. I don't want you to sign or initial anything until you understand what you are signing or initialing. And at which point in time if you have any questions, I will answer your questions. Once I answer your questions we will keep moving forward."[10] Agent G. advised Appellee that he was

---

[8] App. Ex. XI at 6.

[9] App. Ex. XI at 7.

[10] *Id.*

suspected of violating Articles 128b and 119b of the UCMJ. Appellee initialed the form indicating that he understood what crimes he was suspected of committing. Agent G. then told Appellee, "If you have any questions feel free to stop me and I will gladly answer your questions."[11]

The following exchange occurred between Appellee and Agent G. at 04:44 through 06:38 of the CID interrogation video:

Appellee: "I do have a question before we start."

Agent G.: "What's up?"

Appellee: "Um so, I need a lawyer."

Agent G.: "You need a lawyer?"

Appellee: "Yeah, I need a lawyer. I'm supposed to get one today."

Agent G.: "Okay, are you wanting one for this interview or do you need to get one for a different proceeding?"

Appellee: "For everything."

Agent G.: "For everything?"

Appellee: "Yeah, I have to get one."

Agent G: "You have to get one? Okay, so we will go through that process right now. Just let me do these advisals [sic], and then if you want to invoke your right to seek legal counsel, you can do so, okay."
. . .

(Agent G. then read verbatim the rights off the Article 31(b) form.)

. . .

Agent G.: "Do you understand your rights as I have read them?"

Appellee: "Yeah I understand."

Agent G.: "Okay, if you understand your rights, I just need you to initial next to each number."

---

[11] *Id.*

Appellee began initialing the form. While signing the form, the following further exchange occurred:

Appellee: "Would you think I need a lawyer for this?"

Agent G.: "Honestly, I cannot recommend any sort of actions based off of that. It is entirely your decision; it is entirely up to you."

Appellee: "I don't want to make this process any harder than it already is, so we're not going to get a lawyer involved into this right now, but later on."

Agent G.: "So you are still wanting to talk to me today?"

Appellee: "Oh yeah, most definitely."

(Agent G. had Appellee read the statement aloud, acknowledging his waiver.)

Agent G.: "Is that statement true and accurate?"

Appellee: "True and accurate."

Agent G.: "Ok I just need you to initial before and after and I'll have you sign, date, and time."[12]

At 20:52 in the interrogation video, Agent G. referred to the statement Appellee made to SgtMaj H. earlier that morning and told Appellee that his version of events is not what happened.[13] In the 37th minute of the video, Appellee admitted to Agent G. that he punched the child in the head one time with a closed fist because she would not stop crying and stated that he was frustrated and could not handle the crying any longer.

This military judge suppressed the statements to SgtMaj H. and to CID. The Government does not appeal suppression of the statement to SgtMaj H., but does appeal the suppression of the 23 March statement to CID. On Appeal, the Government contended that certain of the military judge's findings of fact were clearly erroneous, and suppression of the statement constituted an abuse of discretion.

In its motion for reconsideration, the Government argues that the Court erred in (1) applying the wrong standard of review to the issue of whether an invocation of the right to counsel is a finding of fact or a conclusion of law; and

---

[12] App. Ex. XI at 7-8.

[13] App. Ex. XI at 8.

(2) contends that the back-and-forth verbal exchange between Appellee and CID Agent G. was merely a reading of rights and not questioning. Because we find merit in the Government's first point, we issue this reconsidered opinion.

## II. DISCUSSION

### A. Standards of review

*1. This Court reviews a military judge's findings of fact under a "clearly erroneous" standard.*

The military judge's extensive findings of fact are contained in Appellate Exhibit XI. And because this case comes to us on as an Article 62, UCMJ, appeal, we do not have the same factfinding power we have under Article 66.[14] Overturning a finding of fact as clearly erroneous is a very high bar to meet. To be "clearly erroneous" a finding of fact "must be more than just maybe or probably wrong; it must strike us with the force of a five-week-old unrefrigerated dead fish."[15]

*2. "Abuse of discretion" is a very high standard.*

We review a military judge's suppression of statements for an abuse of discretion.[16] This Court considers the evidence in the light most favorable to the party that prevailed below.[17] On a mixed question of law and fact, as in this case, a military judge abuses his or her discretion if either his or her findings of fact are clearly erroneous, or his or her conclusions of law are incorrect.[18] Abuse of discretion is a strict standard, "calling for more than a mere difference

---

[14] *See Gore,* 60 M.J. at 185; *Maza,* 73 M.J. at 513; *see generally Flanner* 2023 CCA LEXIS 428 (resolving a Government appeal under Article 62, UCMJ without finding additional facts.).

[15] *United States v. Cooper,* 80 M.J. 664, 672 n.41 (N-M. Ct. Crim. App. 2020) (citations omitted) *affirmed* 82 M.J. 6 (C.A.A.F. 2021).

[16] *See United States v. Freeman,* 65 M.J. 451, 458 (C.A.A.F. 2008); *Maza,* 73 M.J. at 513.

[17] *See United States v. Rivera,* 83 M.J. 528, 532 (N-M. Ct. Crim. App. 2022).

[18] *United States v. Ayala,* 43 M.J. 296, 298 (C.A.A.F. 1995). "On matters of fact with respect to appeals under Article 62, UCMJ, this Court is 'bound by the military judge's factual determinations unless they are unsupported by the record or clearly erroneous.'" *United States v. Becker,* 81 M.J. 483, 489 (C.A.A.F. 2021) (quoting *United States v. Pugh,* 77 M.J. 1, 3 (C.A.A.F. 2017)) (citation omitted).

of opinion."[19] A military judge abuses his or her discretion when he or she: (1) "predicates a ruling on findings of fact that are not supported by the evidence of record," (2) "uses incorrect legal principles," (3) "applies correct legal principles to the facts in a way that is clearly unreasonable," or (4) "fails to consider important facts."[20] We review de novo any conclusions of law supporting the suppression ruling.[21]

### 3. Standards for Miranda Warnings.

The United States Constitution provides, "No person…shall be compelled in any criminal case to be a witness against himself."[22] In *Miranda v. Arizona*, the Supreme Court held, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."[23] The *Miranda* Court further specified that "prior to any questioning, the person must be warned that he has a right to remain silent, that any statements he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."[24]

A criminal defendant's involuntary statement is inadmissible at trial.[25] Statements are deemed involuntary if obtained "in violation of the self-incrimination privilege or Due Process Clause of the Fifth Amendment to the United States Constitution, Article 31, or through the use of coercion, unlawful influence, or unlawful inducement."[26] As the Defense made an appropriate objection to the admission of Appellee's statement in the proceedings below, the Government bore the burden of establishing the voluntariness of the statement by a preponderance of the evidence.[27] Voluntariness turns on whether a criminal

---

[19] *United States v. Jones*, 73 M.J. 357, 360 (C.A.A.F. 2014) (citation omitted).

[20] *United States v. Rudometkin*, 82 M.J. 396, 401 (C.A.A.F. 2022) (citation omitted).

[21] *United States v. Lewis*, 78 M.J. 447, 453 (C.A.A.F. 2019) (citation omitted); *United States v. Chatfield*, 67 M.J. 432, 437 (C.A.A.F. 2009).

[22] U.S. Const. amend. V.

[23] 384 U.S. 436, 444 (1966).

[24] *Id.*

[25] Mil. R. Evid. 304(a).

[26] Mil. R. Evid. 304(a)(1)(A).

[27] Mil. R. Evid. 304(f)(6)-(7).

suspect's "will has been overborne."[28] In the course of our review, "[t]he necessary inquiry is whether the confession is the product of an essentially free and unconstrained choice by its maker."[29]

Courts assess voluntariness based on the totality of the circumstances, including both the characteristics of the criminal suspect and the details of the interrogation.[30] Courts look to the condition of the suspect, including his health, age, education, and intelligence; the character of the detention, including the conditions of the questioning and rights warning; and the manner of the interrogation, including the length of the interrogation and the use of force, threats, promises, or deceptions.[31] The determination of the voluntariness seldom turns on one factor alone, and the weight given to each factor depends on the circumstances and the suspect's state of mind.[32] With regard to rights warnings, whether rights were voluntarily waived is not a separate and distinct question from the voluntariness of a statement, but rather a factor to be considered in the totality of the circumstances as to whether the statement was voluntary.[33]

*4. Standards as to whether someone has invoked the right to counsel.*

The U.S. Supreme Court could not be clearer. "When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."[34] Moreover, to unambiguously and unequivocally invoke the right to counsel, a suspect must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.[35] Of course, once an

---

[28] *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).

[29] *United States v. Bubonics*, 45 M.J. 93, 95 (C.A.A.F 1996).

[30] *Freeman*, 65 M.J. at 453 (C.A.A.F. 2008) (citing *Bustamonte*, 412 U.S. at 226).

[31] *United States v. Ellis,* 57 M.J. 375, 379 (C.A.A.F. 2002).

[32] *United States v. Jones*, 34 M.J. 899, 906 (N-M.C.M.R. 1992) (citing *Bustamonte*, 412 U.S. at 226).

[33] *Id.* at 908 n.6.

[34] *Edwards v. Arizona*, 451 U.S. 477, 484 (1981) (citation omitted).

[35] *See Davis v. United States*, 512 U.S. 452, 459 (1994).

unambiguous invocation of the right to counsel is made, authorities must immediately cease questioning.[36]

As the Government correctly notes in its Motion for Reconsideration, the issue of whether a suspect has invoked his or her right to an attorney, is a question of law we review de novo.[37] Further, whether an interrogation occurred is likewise a question of law, which we review de novo.[38] To put a finer point on it, we also review de novo whether the CID Agent's post-invocation communication with a suspect constituted an interrogation.[39]

*5. Standards for cleansing warnings.*

Where an earlier statement is "involuntary" only because the accused had not been properly warned of his Article 31(b), UCMJ rights, the voluntariness of the second statement is determined by the totality of the circumstances.[40] The earlier unwarned statement is a factor in this total picture, but it does not presumptively taint the subsequent statement.[41] If a "cleansing warning" has been given – where the accused is advised that a previous statement cannot be used against him – that statement should be taken into consideration.[42] If a cleansing warning is not given, however, its absence is not necessarily fatal to a finding of voluntariness.[43]

## B. The military judge's ruling was not an abuse of discretion.

The military judge found a clear *Edwards* violation.

> The Court finds the Accused was in custody on 23 March 2023 when he spoke to CID. While CID was discussing the Article

---

[36] *See Michigan v. Mosely*, 423 U.S. 96, 104 (1975); Mil. R. Evid 305(c)(4).

[37] *See United States v. Davis,* 36 M.J. 337, 341 (C.M.A. 1993); but *see United States v. Smith-Mitchell*, No. 200400304, 2005 CCA Lexis 368 at *10, (N-M. Ct. Crim App. Nov. 22, 2005)(stating that "[w]hether the appellant's statement was a request for a lawyer is a question of fact.")(*citing United States v. Ford*, 51 M.J. 445, 451 (C.A.A.F. 1999.)

[38] *See United States v. Kosek*, 41 M.J. 60, 63 (C.M.A. 1994).

[39] *See Maza*, 73 M.J. at 519 (further citations omitted).

[40] *United States v. Brisbane*, 63 M.J. 106, 114 (C.A.A.F 2006).

[41] *Id.*

[42] *Id.*

[43] *See generally Id.*

31(b) rights advisory form with the Accused, the Accused unambiguously invoked his Fifth Amendment right to request to be represented by counsel during the interrogation.[44]

The Government does not argue in its brief that Appellee was *not* in custody at CID.[45] Regardless, the military judge's ruling that Appellee was in custody at CID is not an abuse of discretion.[46] The Government's various arguments that an *Edwards* violation did not occur at CID are unavailing.[47] In its brief, the Government also does *not* argue that Appellee did not invoke his right to seek an attorney.[48] And at oral argument in this case the Government largely conceded that Appellee's request for an attorney was unambiguous. Moreover, although it was not a disputed issue in this appeal, reviewing de novo, we agree that the conclusion of law that Appellee unambiguously invoked his right to counsel was correct. The military judge based his conclusion of law upon the exchange (reproduced *supra*) during the rights reading, which is reproduced largely verbatim in his ruling[49] (and in the Government's "statement of facts" section of its brief).[50]

Of note, in response to the "Yeah, I have to get one" statement, the CID Agent stated, "You have to get one. Okay, so we will go through the process right now. Just let me do these advisals (sic), and then if you want to invoke your right to seek legal counsel, you can do so."[51] The crux of the Government's

---

[44] App. Ex. XI at 16.

[45] *See generally* Government's Brief. At oral argument, the Government readily conceded that Appellee was in custody while at CID.

[46] The question of whether a person is in custody is a mixed question of fact and law. *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *see also United States v. Miller,* 46 M.J. 80, 84 (C.A.A.F. 1997).

[47] The concurring opinion correctly identifies a separate reason for affirming the military judge's suppression of Appellee's statement to CID, although we do not resolve the Government's appeal on that basis.

[48] See, e.g., Government's Brief at 27 and 30.

[49] AE XI at 16. ("Accused" refers, of course, to Appellee in this case).

[50] Government's Brief at 7-8.

[51] Government's Brief at 8.

argument is that "the agent's request that Appellee complete the form was instead a narrow request, rather than an interrogation."[52] The Government doubles down on this dubious proposition in its motion for reconsideration, broadly stating that a reading of a rights advisement after invocation is not an interrogation.[53] But under Appellant's theory, after an Accused invokes his or her right to an attorney, a Government agent may continue reading (and re-reading) rights advisments *ad taedium* until the suspect changes his or her mind. This is not what the plain language of Mil. R. Evid 305(c)(4) means by "questioning must cease until counsel is present."

The military judge found that "instead of ceasing questioning once the invocation was unambiguous, Agent G. told the accused that he needed to continue to read the rights advisements."[54] Reviewing this question of fact, it is not clearly erroneous, as it is supported by the videotape of the interview.

The Government further argues that Appellee's subsequent statement waiving his rights, made minutes later during the same encounter, somehow undid the prior invocation -- as a purported re-initiation of a conversation that had not ended. The Government's argument on this point remains unpersuasive. The military judge properly found that Appellee's question "would you think I need a lawyer for this?" "was *not* a lawful re-initiation of contact with law enforcement by the Accused consistent with *United States v. Maza . . . .*"[55] This military judge appropriately analyzed *Maza* and distinguished the important facts that in that case, that the accused was left in the interrogation room while the agent attended to some administrative matters and 15-30 minutes later the accused stepped out of the interrogation room to inform the agent that he had changed his mind.[56] Here though, there was no break in time and the agent did not pause, or leave the room (or even get up from the chair he was sitting on). Nor is there any binding legal authority for the proposition that a law enforcement agent may somehow defer the temporal effect of a suspect's unequivocal invocation and continue to discuss the rights advisement

---

[52] Government's Brief at 10. The military judge properly analyzed this exchange and concluded subsequent responses to an officer's questions or clarifications "may not be used to cast retrospective doubt of the clarity of the initial request." App. Ex. XI at 16 citing *Smith v. Illinois*, 469 U.S. 91, 100 (1984).

[53] *See generally* Appellant's Motion for Reconsideration at 5-6.

[54] AE XI at 16. (Agent G's statement, of course, is not legally true.)

[55] App. Ex. XI at 16-17 (citing *Maza*, 73 M.J. 507).

[56] App. Ex. XI at 16-17, n. 68.

form.[57] Reviewing the conclusions de novo we are convinced that the military judge's conclusions that Appellee unambiguously requested the assistance of an attorney, and that questioning did not immediately cease, are not erroneous (and in fact are unquestionably confirmed by the videotape in the record, Appellate Exhibit VII). Rather, the military judge properly found that the CID Agent did not "scrupulously honor" Appellee's unambiguous invocation of his right to counsel.[58] Accordingly, we hold that the military judge did not abuse his discretion in suppressing Appellee's statement to the CID Agent.

We pause to consider a separate, independent basis to uphold the military judge's ruling suppressing Appellee's statement to the CID Agent.[59] Without question, as the military judge correctly found – and the concurring opinion correctly states – that based on the facts of this case, SgtMaj H. should have read Appellee hisArticle 31(b) UCMJ rights prior to asking him "What happened?"[60] The military judge further found that "whether purposeful or not, CID used SgtMaj H as a fact-finding tool to gather potentially incriminating information from the accused."[61] This finding of fact is not clearly erroneous. Moreover, the finding of fact that agents from CID then used this information as part of its interrogation[62] is likewise not clearly erroneous. Accordingly, the military judge found that under the circumstances of this case, prior to questioning Appellee, the CID Agent should have provided him with a valid cleansing warning related to the statement made to SgtMaj. H.[63] Reviewing that conclusion of law de novo, we find that the military judge did not err.

---

[57] See Mil. R. Evid 305(c)(4) (stating that questioning must cease until counsel is present.)

[58] AE XI at 16.

[59] Although we did declined to reach this issue in our prior opinion, upon reconsideration, we feel it helpful to explain this issue and our reasoning.

[60] AE XI at 15. The Government did not appeal this aspect of the Military Judge's ruling.

[61] AE XI at 17.

[62] AE XI at 17.

[63] AE XI at 17.

### III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, and the excellent oral arguments of both counsel heard at the Washington Navy Yard on 29 May 2024, we have determined that the military judge did not abuse his discretion in suppressing Appellee's 23 March 2023 statement to CID.

The ruling of the military judge is **AFFIRMED** as to the issue appealed by the Government under Article 62, UCMJ and the Government's Appeal is **DENIED**. The Stay of Proceedings is **LIFTED**. The record is forwarded to the Judge Advocate General for return to the convening authority.

MIZER, J. concurring:

I concur in the opinion of my learned colleagues, and I join it in full. I write separately to express my view that the Court's opinion says both too much and too little.

With respect to saying too much, in certain contexts our superior Court has admonished military judges that they must show their work.[64] The military judge did that here, in spades. The Court has before it a tightly-drafted, eighteen-page ruling that is thorough and both well researched and written. And "as long as a CCA indicates that it has considered an issue raised by an appellant, a single sentence disposition is sufficient."[65] In resolving *this* case with anything more than a single sentence, I respectfully submit my friends say more than is necessary.[66]

But if we must write more, my friends say too little. The military judge's extensive findings of fact instruct us that, after Appellee and his wife brought their infant daughter to the emergency room with injuries consistent with child abuse for the *second time*, Appellee's battalion commander ordered his Sergeant Major (SgtMaj) to have Appellee questioned by the Marine Criminal Investigative Division (CID). And like any good Marine Corps noncommissioned officer, SgtMaj H. set about doing exactly that.

On 23 March 2023, SgtMaj H. ordered Appellee to appear at his office where Appellee was required to formally report. Once there, SgtMaj H. began questioning Appellee, a lance corporal, about his daughter's injuries. As noted by the military judge, SgtMaj H. did so without informing Appellee of his Article 31(b), UCMJ, rights.[67]

Appellee would later testify that, during this questioning, he told SgtMaj H. that he wanted to speak with an attorney, and he had an appointment to do so that very afternoon.[68] SgtMaj H. testified he did not remember such a

---

[64] *See, e.g., United States v. Keago,* __ M.J. __, No. 23-0021, 2024 CAAF LEXIS 256, (C.A.A.F. May 9, 2024).

[65] *United States v. Guinn,* 81 M.J. 195, 204 (C.A.A.F. 2021) (citing *United States v. Matias,* 25 M.J. 356, 361 (C.M.A. 1987)).

[66] It is not for nothing that our superior Court has summarily disposed of Government appeals certified to the Court by the Judge Advocates General when warranted. *See, e.g., United States v. Soto,* 74 M.J. 350 (C.A.A.F. 2015) (summary disposition); *United States v. Bowser,* 74 M.J. 326 (C.A.A.F. 2015) (summary disposition).

[67] App. Ex. XI at 5.

[68] *Id.*

request.[69] But immediately after the meeting, SgtMaj H. sent a text to the battalion commander informing him that Appellee had a meeting with an attorney that afternoon.

Unsurprisingly, the military judge found that SgtMaj H. "knew the Accused desired to speak with an attorney on 23 March 2023[.]"[70] And it is not clearly erroneous to conclude that an accused who informs his inquisitor that he wants to speak to an attorney, and even has an appointment to do so a few hours later, has unambiguously invoked his right to counsel.

However, because the military judge suppressed Appellee's statements to SgtMaj H. pursuant to Article 31, UCMJ, he didn't address the violation of *Edwards v. Arizona*[71] illuminated by his findings of fact. And while it was entirely within his discretion to do so,[72] nothing would preclude this Court from, as a matter of law, resolving the Government's appeal on this earlier violation of *Edwards*.[73] And in failing to do so, I humbly submit my friends say too little.

You see, upon being ordered to formally report to a battalion sergeant major, no reasonable lance corporal would—or ever should—believe that he could thank the sergeant major for the invitation but politely decline. And once SgtMaj H's custodial interrogation[74] began, and Appellee expressed his desire to deal with law enforcement only through counsel, he was not subject to further questioning until counsel was made available to him.[75]

---

[69] *Id.*

[70] *Id.* at 6.

[71] 451 U.S. 477, 101 S. Ct. 1880 (1981).

[72] I am mindful that trial judges are busy, and appellate judges opine in the cool of the evening as to the toils of trial judges in the heat of the day.

[73] The Government has asked us whether the military judge erred when he suppressed Appellee's March 23, 2023, statement to Marine CID. Having asked *that* question, the Court should, to borrow from the poet Elizabeth Barrett Browning, "count the ways" in which the Government violated *Edwards* in this case. *See generally,* ELIZABETH BARRET BROWNING, *"HOW DO I LOVE THEE?"*, SONNETS FROM THE PORTUGUESE 43 (1850).

[74] *See United States v. Chatfield*, 67 M.J. 432, 438 (C.A.A.F. 2009) (holding that custody is determined by how a reasonable person in the position of the accused would gauge the breadth of his or her freedom of action).

[75] *See United States v. Mitchell*, 51 M.J. 234, 238 (C.A.A.F. 1999).

The appropriate response to an invocation of the right to counsel is *never* to direct a staff noncommissioned officer to drive an accused to CID so that they may have a go at questioning an accused. An accused need not thrice request counsel,[76] and it is my view that, absent Appellee initiating further communications with law enforcement, what took place at the CID is irrelevant.

And by not resolving this case on that basis, or further relying upon it, I part company with my friends.

In the end, the military judge left nothing unsaid:

> Various government actors worked together to gather information about the incident, including directly soliciting the information from the Accused, then confronting the Accused with that information. The Government as a whole is required to honor the Accused's Article 31(b) and Fifth Amendment rights. That was not done in this case.[77]

FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[76] *Neal v. State*, 451 So. 2d 1058, 1060 (Fla. Dist. Ct. App. 1984); *but cf.*, LEWIS CAROL, THE HUNTING OF THE SNARK 3 (1876) ("I have said it thrice: What I tell you three times is true.").

[77] App. Ex. XI at 17.